# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE    MAY 09 2013

*Madsen, C.J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on May 9, 2013

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent,<br><br>v.<br><br>BRANDON S. CORISTINE,<br><br>    Petitioner. | NO. 86145-5<br><br>EN BANC<br><br>Filed  MAY 09 2013 |

STEPHENS, J.—This case asks us to determine whether the trial court violated petitioner Brandon Coristine's constitutional rights by offering an affirmative defense instruction over his objection. Coristine argues that offering the instruction to the jury violated his right to control his defense. We hold that where a defendant chooses not to argue or invoke an affirmative defense, offering an instruction on the defense over the defendant's objection violates the Sixth Amendment to the United States Constitution. We reverse the Court of Appeals and remand for a new trial.

### FACTS AND PROCEDURAL HISTORY

Coristine was charged with rape in the second degree arising out of events during a house party at his residence in Spokane, Washington. To prove rape in

the second degree, the State must prove beyond a reasonable doubt that the defendant engaged in sexual intercourse with someone who was incapable of consent by reason of being physically helpless or mentally incapacitated. RCW 9A.44.050(1)(b).

At trial, the State presented testimony that Coristine's alleged victim, L.F., drank heavily at the party and went to sleep and that some time later Coristine came into her room and had sexual intercourse with her as she lay on her stomach coming in and out of consciousness. Coristine and two other defense witnesses—Coristine's wife and his sister-in-law—testified that L.F. consumed alcohol at the party but did not appear to be intoxicated. Coristine also testified that L.F. initiated the sexual intercourse and was an active and willing participant.

After the close of evidence, the trial court held an instruction conference at which the sole contested issue was whether to read a jury instruction on the statutory affirmative defense of "reasonable belief." *See* RCW 9A.44.030(1). Coristine's counsel objected to the instruction, arguing that Coristine's defense was simply that the State failed to prove L.F. was incapacitated. 3 Verbatim Report of Proceedings (VRP) at 397. The prosecutor argued in favor of giving the instruction, asserting the court was *required* to give the instruction if Coristine "bolster[ed]" his case by offering "any additional evidence" that the victim was not incapacitated, including witness testimony. 3 VRP at 395. The trial court was skeptical at first, noting that Coristine was free to choose his own defense, but

eventually accepted the State's argument. 3 VRP at 395-99. Over Coristine's

objection, the court read the following pattern instruction to the jury:

> It is a defense to a charge of rape in the second degree that at the time of the act the defendant reasonably believed that [L.F.] was not mentally incapacitated or physically helpless. The defendant has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all of the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty as to this charge.

3 VRP at 409-10; *see* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY

INSTRUCTIONS: CRIMINAL 19.03, at 296 (3d ed. 2008). After the instructions were

given, each side presented closing argument. Coristine reiterated his failure-of-

proof defense, arguing that testimony from defense witnesses about L.F.'s alcohol

consumption and behavior at the party cast doubt on the State's allegation that L.F.

was physically helpless or mentally incapacitated during sexual intercourse.

Neither side mentioned the affirmative defense of reasonable belief.

The jury deliberated for two days and found Coristine guilty of rape in the

second degree. The Court of Appeals affirmed the conviction. *State v. Coristine*,

161 Wn. App. 945, 252 P.3d 403 (2011). We granted discretionary review. *State

v. Coristine*, 172 Wn.2d 1014, 262 P.3d 63 (2011).

## ANALYSIS

In order to further the truth-seeking aim of a criminal trial and to respect

individual dignity and autonomy, the Sixth Amendment gives the accused the right

to present a defense. Consistent with this right, the Sixth Amendment requires deference to the defendant's strategic decisions.

Because an affirmative defense is one the defendant may raise, the Sixth Amendment requires courts to honor an intelligent and voluntary choice to forgo an affirmative defense. Instructing the jury on an affirmative defense over the defendant's objection violates the Sixth Amendment by interfering with the defendant's autonomy to present a defense.

A.   The Sixth Amendment Protects a Defendant's Autonomy

The Sixth Amendment guaranties of compulsory process, confrontation, and the assistance of counsel help ensure fair trials. *See Faretta v. California*, 422 U.S. 806, 818-21, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). These assurances safeguard the truth-seeking function of criminal trials. In putting the State to its proof, a defendant may call witnesses, cross-examine the State's witnesses, and have the assistance of counsel, thereby guarding against a wrongful conviction. *See, e.g., Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) ("[P]artisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.").

Presenting one's own defense also affirms individual dignity and autonomy. *See McKaskle v. Wiggins*, 465 U.S. 168, 176-77, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (noting that the Sixth Amendment right to conduct one's own defense "exists to affirm the dignity and autonomy of the accused"); *see also Portuondo v.*

*Agard*, 529 U.S. 61, 76, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000) (Stevens, J., concurring) (noting that a "defendant's Sixth Amendment right 'to be confronted with the witnesses against him' . . . reflects respect for the defendant's individual dignity and reinforces the presumption of innocence").

To further the truth-seeking function of trial and to respect the defendant's dignity and autonomy, the Sixth Amendment recognizes the defendant's right to control important strategic decisions. *See McKaskle*, 465 U.S. at 177 ("[T]he primary focus must be on whether the defendant had a fair chance to present his case in his own way."); *State v. Jones*, 99 Wn.2d 735, 742, 644 P.2d 1216 (1983) (defendant's fundamental right to make decisions about the course of the defense is mandated by "'respect for [his or her] freedom as a person'" (quoting *Frendak v. United States*, 408 A.2d 364, 376 (D.C. 1979))).

B.     Courts Must Respect a Defendant's Right To Forgo an Affirmative Defense

The Sixth Amendment right to control one's defense encompasses the decision to present an affirmative defense. We first recognized this principle in *Jones*, 99 Wn.2d 735. In *Jones*, the trial court entered a plea of not guilty by reason of insanity over the defendant's objection and allowed the introduction of evidence of insanity after the defense presented its case. *Id.* at 739. The jury found the defendant to be insane at the time he committed the crime. *Id.* at 738.

We granted the defendant a new trial. Relying on *Faretta*, we observed that "a defendant has a *constitutional* right to at least broadly control his own defense." *Jones*, 99 Wn.2d at 740. In *Faretta*, the United States Supreme Court held the

Sixth Amendment grants criminal defendants the personal right to self-representation at trial. 422 U.S. at 819. We noted that *Faretta* stands for "'the conviction that a defendant has the right to decide, within limits, the type of defense he wishes to mount.'" *Jones*, 99 Wn.2d at 740 (quoting *United States v. Laura*, 607 F.2d 52, 56 (3d Cir. 1979)); *see also North Carolina v. Alford*, 400 U.S. 25, 33, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970) (quoting *Tremblay v. Overholser*, 199 F. Supp. 569, 570 (D.D.C. 1961) ("[Courts] should not 'force any defense on a defendant in a criminal case.'")).

In line with *Faretta* and *Alford*, we reasoned that "'respect for a defendant's freedom as a person mandates that he or she be permitted to make fundamental decisions about the course of proceedings.'" *Jones*, 99 Wn.2d at 742 (quoting *Frendak*, 408 A.2d at 376). Such respect demands that "courts do not impose . . . defenses on unwilling defendants." *Id.* at 743. Imposing a defense on an unwilling defendant impinges on the independent autonomy the accused must have to defend against charges. As the Court proclaimed in *Faretta* in upholding the right to self-representation, "[u]nless the accused has acquiesced . . . , the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." *Faretta*, 422 U.S. at 821. We concluded that the court must honor the intelligent and voluntary choice of a competent defendant to forgo an insanity defense. *Jones*, 99 Wn.2d at 746.

Our reasoning in *Jones* was followed in *State v. McSorely*, 128 Wn. App. 598, 116 P.3d 431 (2005). There, the State requested an instruction on an

affirmative defense to the charge of child luring, an instruction to which the defendant "most strenuously" objected. *Id.* at 603. Nevertheless, the trial court granted the State's motion, instructing the jury that "'[i]t is a defense to a charge of luring that . . . [t]he defendant's actions were reasonable under the circumstances[] and . . . [t]he defendant did not have any intent to harm the health, safety, or welfare of the minor.'" *Id.* (quoting Clerk's Papers at 13).

Relying on *Jones*, *Alford*, and *Faretta*, the Court of Appeals reversed, holding a new trial was required. *McSorely*, 128 Wn. App. at 605. Quoting *Jones*, the *McSorely* court emphasized that the Sixth Amendment prohibits courts from "'forc[ing] *any* defense on a defendant in a criminal case.'" *Id.* (internal quotation marks omitted) (quoting *Alford*, 400 U.S. at 33).

In concluding the Sixth Amendment gives a defendant the right to forgo an available affirmative defense, the *McSorely* court correctly extended *Jones*. As with the decision to plead guilty by reason of insanity, the decision to offer an affirmative defense cannot be forced on an unwilling defendant. *See Jones*, 99 Wn.2d at 743. An affirmative defense places a burden of proof on the defendant, thus shaping the defense by introducing elements it must prove. This process may influence a wide range of strategic trial decisions, such as who is called to testify, the questions asked on direct- and cross-examination, and what arguments are made in summation.

Instructing the jury to consider an affirmative defense over the defendant's objection interferes with the accused's right to present a chosen defense. The Sixth

Amendment places this important strategic decision squarely in the hands of the defendant, not the prosecutor or the trial court.

C.    Instructing the Jury on "Reasonable Belief," Over Coristine's Objection, Violated His Sixth Amendment Rights

Coristine maintains he elected to forgo an affirmative defense as a matter of strategy; his sole defense was that the State failed to prove its case. The State disputes this, arguing that Coristine raised the affirmative defense by testifying that L.F. did not "appear" drunk. But Coristine's testimony served to cast doubt on the State's case, consistent with his defense that L.F. was capable of consent. There is no basis to conclude Coristine offered this testimony in support of an unargued defense that he *reasonably believed* that L.F. was not mentally incapacitated or physically helpless. Rather, it supported his argument that she was not in fact incapacitated or helpless.

Writing approvingly of the trial court's decision to force an affirmative defense on Coristine, the Court of Appeals argued that failure to give the instruction "might well have been error." *Coristine*, 161 Wn. App. at 951. This is incorrect. While an attorney's failure to recognize and raise an affirmative defense can fall below the constitutional minimum for effective representation, the record here confirms a valid strategic decision. *See In re Pers. Restraint of Hubert*, 138 Wn. App. 924, 928-29, 158 P.3d 1282 (2007) ("'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable.'" (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))).

The distinction is between failing to recognize a defense and validly waiving one. Once a trial court determines that a defendant's waiver of an affirmative defense is voluntary and intelligent, it cannot direct the defense it believes is necessary to ensure constitutionally effective counsel at the expense of the defendant's right to control a chosen defense. Because Coristine validly waived his right to mount a reasonable belief affirmative defense, the trial court violated his Sixth Amendment rights when it failed to respect his decision.

D.    The Sixth Amendment Violation Is Not Harmless

We must determine whether the constitutional error in this case warrants vacating Coristine's conviction and remanding for a new trial. Some fundamental constitutional errors "are so intrinsically harmful as to require automatic reversal," but for "all other constitutional errors," we apply harmless-error analysis to determine whether reversal is appropriate. *See Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). In *Jones*, we recognized that a violation of the defendant's right to control his own defense may be subject to review for harmless error. 99 Wn.2d at 748.[1]

---

[1] To be clear, absolute denial of a defendant's right to control the defense is structural error and not subject to harmless-error analysis. *See, e.g., McKaskle*, 465 U.S. at 177 n.8. However, we review lesser deprivations of this right for harmless error. *See Jones*, 99 Wn.2d at 748. As in *Jones*, the error here was not an absolute deprivation. We therefore presume that it caused prejudice and reverse and remand for a new trial unless the State proves it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

The notion of constitutional harmless error arrived relatively late to American courts. Although federal law and procedure had long allowed appellate courts to decide cases "without regard to errors or defects which do not affect the substantial rights of the parties," 28 U.S.C. § 2111, and although all 50 states had harmless-error statutes in place by 1967, the Supreme Court's ratification of *constitutional* harmless-error analysis in *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) was a landmark.

*Chapman* held that if trial error is of constitutional magnitude, prejudice is presumed and the State bears the burden of proving it was harmless beyond a reasonable doubt. *Id.* at 24; *accord State v. Irby*, 170 Wn.2d 874, 886, 246 P.3d 796 (2011). The Court announced this rule as a constitutional minimum protection for the rights of accused persons, observing that "we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights." *Chapman*, 386 U.S. at 21. Although Justice González's dissent today invites the court to adopt an imaginative new test for harmless error, the parties did not brief this issue and we did not grant review to consider it. We therefore decline to engage in an unnecessary debate about the merits of our present test.

Under the *Chapman* standard, the State has not demonstrated that forcing an affirmative defense upon Coristine after the close of the evidence was harmless beyond a reasonable doubt. Preliminarily, the error in this case was not merely the giving of a gratuitous or unnecessary correct instruction. This is because the injury

was not to Coristine's right to be tried by a jury applying accurate instructions of law. Instead, the trial court erred by denying Coristine his Sixth Amendment right to mount the defense of his choosing. *McKaskle*, 465 U.S. at 177-78. A deprivation of this right respecting individual autonomy is error even if the trial court's instructions in the law are a model of accuracy. Indeed, if seizing control over a defendant's trial strategy were harmless so long as the court correctly instructed the jury in the defense it chose, little would remain of the Sixth Amendment right to control one's defense.

On the facts of this case, the presence of the unwanted instruction was not inconsequential to the jury's deliberations. First, the instruction risked confusion between the jury's consideration of the victim's capacity and Coristine's "reasonable belief" in her capacity, an issue that had not been directly addressed in the evidence. We need not determine whether the affirmative defense instruction shifted the burden of proof to the defense on the issue of capacity, as Coristine asserts. It certainly impacted jury deliberations by interfering with Coristine's straightforward presentation of his sole defense—that L.F. was in fact not incapacitated. The likelihood of confusion was compounded here by the fact that the jury heard no testimony about reasonable belief, as the instruction was not forced upon Coristine until after the close of the evidence.

Chief Justice Madsen, in a separate dissent, argues that the timing of the decision to give the affirmative defense instruction—after the close of the evidence—was somehow *less* prejudicial than the alternative. Dissent (Madsen,

C.J.) at 4. The argument rests solely on a comparison between this case and *Jones*, i.e., at least Coristine was not required to maintain inconsistent theories of defense from the start of the trial, as was Jones. But we cannot conclude Coristine suffered less prejudice as a result. Because the trial court in *Jones* forced the defendant to mount an insanity defense at the outset of his trial, Jones had the opportunity to present evidence, expert or other testimony, and cross-examination addressing this alternative theory. *Jones*, 99 Wn.2d at 738-39. In Coristine's case, the affirmative defense was presented to the jury after the opportunity had passed for Coristine to offer evidence to support it. 3 VRP at 393, 399. We cannot agree with Chief Justice Madsen that a defendant who does not have the opportunity to support an unwanted defense by offering evidence somehow suffers less prejudice than one who does.[2]

The presence of an unwanted affirmative defense instruction is particularly problematic in a case, such as this, that involves the relative credibility of a handful of eyewitnesses, including the victim and the accused. We do not share the dissenters' confidence that the instruction was inconsequential or that the two defenses were essentially consistent. Indeed, the mere fact that the parties thought

---

[2] We also note that the errors in *Jones*, while different from those here, do not constitute the necessary or sufficient facts for a finding of reversible error. The question of whether error is harmless or reversible does not rest on bright-line rules; it is contextual and arises from the facts of the case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (reciting "a host of factors" to consider in determining whether error was harmless beyond a reasonable doubt). The question here is not whether or to what degree this case resembles *Jones*, but whether the error was harmless beyond a reasonable doubt. At any rate, Coristine was in fact saddled with inconsistent defenses during the critical period of the jury's deliberations.

it mattered and strenuously debated the giving of the affirmative defense instruction should undermine such confidence. Given the nature of the issues involved, the absence of an opportunity to present evidence tailored to the affirmative defense, and the tension between Coristine's chosen defense and the theory of "reasonable mistake," we cannot say that instructing the jury over his objection was not the "slight impetus" that affected the verdict. *Glasser v. United States*, 315 U.S. 60, 67, 62 S. Ct. 457, 86 L. Ed. 680 (1942). Accordingly, we hold that the violation of Coristine's Sixth Amendment right to control his defense was not harmless beyond a reasonable doubt. Under the *Chapman* standard, a new trial is required.

## CONCLUSION

The trial court violated Coristine's Sixth Amendment right to control his own defense by instructing the jury on an affirmative defense that Coristine did not want to pursue. This constitutional violation was not harmless beyond a reasonable doubt. We reverse the Court of Appeals and remand for a new trial.

Stephens, J.

WE CONCUR:

Johnson, J.

Fairhurst, J.

Chambers, J.P.T.

Wiggins, J., result only

Owens, J.

*State v. Coristine (Brandon S.)*

No. 86145-5

MADSEN, C.J. (dissenting)—I agree with much of what the majority says about the right of a criminal defendant to control his or her defense. However, I disagree with the majority's discussion and resolution of harmless error. Although Justice González's dissent correctly concludes that the error is harmless, I am reluctant to adopt a framework for harmless error for which neither of the parties advocates. Thus, I write separately to affirm.

Discussion

As Justice González's dissent correctly notes, we follow the United States Supreme Court's precedent in reviewing federal constitutional error in criminal trials. Dissent (González, J.) at 5. Applying that precedent, it is clear that "most constitutional errors can be harmless." *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). There is a very limited class of cases—cases involving structural error—in which a harmless error analysis is inappropriate. *See Neder v. United States*, 527 U.S. 1, 7-8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (collecting cases involving structural error). The error in this case does not fit within this small class of cases.

Rather, as the majority correctly notes, the error here, in the broadest sense, is a violation of the Brandon Coristine's right to control his defense. *See generally State v. Jones*, 99 Wn.2d 735, 664 P.2d 1216 (1983). More specifically, however, the error was giving an affirmative defense jury instruction over Coristine's objection. It is the effect of that error that we must evaluate.

In *Jones*, this court held that interposing a plea of not guilty by reason of insanity over the defendant's objection violated the defendant's right "to plead guilty and/or control his own defense." *Id.* at 740. In deciding whether the defendant was entitled to a new trial, the court reviewed the evidence and the defense theories that were argued. The court first observed that the most "obvious" prejudice to the defendant was that "the jury was faced with two defense attorneys arguing conflicting defense theories." *Id.* at 748.[1] The court went on to review all of the evidence that would have been excluded had the insanity plea not been entered and the jury not been instructed on the defense, including the testimony of the defense psychiatrist. Although the *Jones* court was unclear regarding its harmless error test, it concluded that "[i]n light of these evidentiary considerations, it is impossible for us to conclude that Mr. Jones was not prejudiced by the trial court's error." *Id.* at 750.

Since *Jones* was decided, this court has clarified that in the case of constitutional error, "we must 'conclude beyond a reasonable doubt that the jury verdict would have

---

[1] The trial court appointed amicus counsel to argue the insanity defense. "While one attorney was arguing that the defendant was acting as 'a reasonable and ordinarily cautious and prudent person' (Clerk's Papers, at 22 (self-defense instruction)), the other was arguing that he was acting under the influence of paranoid delusions." *Jones*, 99 Wn.2d at 748.

2

been the same absent the error.'" *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889

(2002) (quoting *Neder*, 527 U.S. at 19). Applying this test I would hold the error in this

case was harmless.[2]

Considering the nature of the error, the first question is whether, by instructing the

jury on the affirmative defense, the defendant was saddled with inconsistent defenses.

The answer is no. Coristine was charged with second degree rape under RCW

9A.44.050(1)(b). In order to convict Coristine under that statute, the State was required

to prove that Coristine engaged in sexual intercourse with another person who was

incapable of consent by reason of being mentally incapacitated or physically helpless.

Coristine's theory of defense was that the complaining witness consented to sex and that

she was competent to consent. Coristine intended to make the State prove its case by

proving incompetency to consent. The "to convict instruction" did exactly that and

nothing about the affirmative defense instruction contradicted that defense theory.

Indeed, Coristine's evidence, if believed, proved both that the complaining witness was

competent to consent and that Coristine reasonably believed she was competent.

Coristine also complains that by instructing the jury on the "reasonable belief"

affirmative defense, the trial court shifted the burden of proof to the defense. However,

the State was required to prove mental incapability before the jury could even consider

---

[2] The majority criticizes my reliance on *Jones* for the factors to consider in making a harmless error determination. Majority at 12 n.2. However, *Jones* is the only case from this court that has recognized a constitutional right of a defendant to control his or her defense or to apply a harmless error analysis to the violation of this right. Thus, a comparison with *Jones* is very instructive.

3

the affirmative defense instruction to which Coristine objected. As the Court of Appeals recently said in *State v. Powell*, 150 Wn. App. 139, 157 n.12, 206 P.3d 703 (2009), "[t]his affirmative defense was relevant only once the State proved the elements of the offense. Thus, a 'reasonable belief' instruction would not have shifted the initial burden of proof" to the defendant. Even without the instruction, the jury could have believed the victim's testimony and found Coristine guilty.

Finally, in *Jones*, the court also considered whether any evidence was admitted that would otherwise have been omitted absent the error. Unlike in *Jones*, where the trial court entered a plea of not guilty by reason of insanity, appointed a second attorney to argue insanity, and permitted psychiatric testimony during the trial, the trial court here did not give the offending instruction until after the parties had rested, and Coristine points to no evidence that was improperly admitted due to the court's error.[3]

Using the test adopted by this court, I would hold that the error was harmless and that the conviction must be affirmed.

---

[3] The majority criticizes my harmless error analysis but offers scant analysis of its own. Boiled down, the majority reverses this conviction because it says the affirmative defense instruction "risked confusion" by "interfering" with Coristine's "sole" defense that L.F. was not incapacitated. Majority at 11. Yet, the majority does not argue that the instruction shifted the State's burden to prove L.F.'s incapacity or explain why the jury would even reach the affirmative defense instruction unless it had determined that the State had met its burden to show L.F. was incapacitated. The only other point upon which the majority relies—that the case involved the credibility of a handful of witnesses—is left completely unexplained.

No. 86145-5
Madsen, C.J., dissenting

_Madsen, C.J._

No. 86145-5
Madsen, C.J., dissenting

No. 86145-5

GONZÁLEZ, J. (dissenting)—A jury convicted Brandon Coristine of raping his new roommate on her first night at her new place of residence. I agree with the majority that giving an affirmative defense instruction over Coristine's objection violated his Sixth Amendment right to control his own defense. But not every error merits reversal. This one certainly does not. I respectfully dissent.

I also write separately to observe that we have not established a clear framework of harmless error review in Washington. Until we build and consistently follow such a framework, our opinions in this area will be confusing and inconsistent, and review for harmless error will continue to be "an arbitrary exercise of judicial authority." Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 GONZ. L. REV. 277, 323 (1996).

We can do better. A review of our case law reveals workable standards and suggests a framework that would foster clarity and consistency in this difficult area of the law. In my view, this court should explicitly require a three-step process for appellate review of constitutional errors at criminal trials. First, an appellate court should evaluate whether the error in question requires automatic reversal—what is sometimes called "structural" error. *See, e.g., State v. Frost*, 160 Wn.2d 765, 779-82,

161 P.3d 361 (2007). If the error is among these rarest of errors, the court should simply reverse. Second, if the error is not structural, the court should consider whether the error was plausibly relevant to the verdict. *See, e.g., State v. Bobenhouse*, 166 Wn.2d 881, 894, 214 P.3d 907 (2009). If the court is convinced, beyond a reasonable doubt, that the error was not plausibly related to the verdict, the court should affirm the conviction. Third, if the error is plausibly relevant to the challenged guilty verdict, the court should reverse unless it is persuaded, beyond a reasonable doubt, in light of the full record, that the error did not tip the scales from innocence to guilt. *See, e.g., State v. Rice*, 120 Wn.2d 549, 569, 844 P.2d 416 (1993); *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996). This three-step process would provide our courts with a clear, workable, and effective way of conducting harmless error review and adjudicating whether a constitutional error at trial is harmless. It would foster clearer, more consistent, and more objective precedents. It would help "'cleanse the judicial process of prejudicial error without becoming mired in harmless error.'" *State v. Grenning*, 169 Wn.2d 47, 59 n.8, 234 P.3d 169 (2010) (quoting ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 81 (1970)).

*1. Harmless Error: Federal Standards*

United States Supreme Court precedent has established the minimum requirements state courts must follow in evaluating constitutional error. *See Chapman v. California*, 386 U.S. 18, 20-21, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). An otherwise valid conviction should not be set aside where a reviewing court is

convinced beyond a reasonable doubt that the error was harmless. Errors are inevitable, and many errors, even constitutional ones, do not call the fundamental fairness of the trial into question nor affect the final outcome. *See Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). Upholding fair criminal convictions "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Van Arsdall*, 475 U.S. at 681. It avoids the myriad costs associated with retrials, both to the justice system and to the witnesses haled into court again and again. *See United States v. Hasting*, 461 U.S. 499, 509, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983). In contrast, reversing for harmless errors "'encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'" *Van Arsdall*, 475 U.S. at 681 (quoting TRAYNOR, *supra*, at 50).

There are a limited number of errors that warrant automatic reversal. *See, e.g.*, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-50 & n.4, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006); *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). Such errors are sometimes referred to as "structural" errors. *See, e.g.*, *Gonzalez-Lopez*, 548 U.S. at 148. An error may be deemed structural because it is intrinsically harmful, *Neder*, 527 U.S. at 7, because it necessarily brings into question the fundamental fairness or reliability of the entire trial process, *id.* at 8-9; *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), because assessing its effect in a given case is highly difficult or impossible, *Gonzalez-*

*Lopez*, 548 U.S. at 149 n.4, 150, or because the error substantially implicates some weighty interest other than ensuring a reliable and accurate outcome, *id.* at 149 n.4; *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). I wholeheartedly agree with the majority that the error here was not structural.

For all other constitutional errors, the appellate court must consider whether the error actually might have affected the trial's outcome in order to determine whether reversal is appropriate. *See, e.g., Neder*, 527 U.S. at 17-19. If the court is persuaded, beyond a reasonable doubt, that the error did not affect the verdict, the conviction should be upheld. *Van Arsdall*, 475 U.S. at 681; *see also Chapman*, 386 U.S. at 24. Most constitutional errors are subject to harmless error review, *Gonzalez-Lopez*, 548 U.S. at 148, and most such errors are indeed harmless, *Hasting*, 461 U.S. at 509. The court will consider any plausible effects that such an error might have had on a rational jury, and the error will be deemed harmless if the reviewing court concludes beyond a reasonable doubt that "the jury verdict would have been the same absent the error" and thus "the error 'did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 17 (quoting *Chapman*, 386 U.S. at 24).

Neder was convicted of fraud for using wildly inflated real estate appraisals to secure loans, concealing his ownership interests in various shell corporations, and falsifying documentation. *Id.* at 4-5. The trial court failed to instruct the jury that the defendant's false statements must have been "material[]" to convict, omitting an element of the charged crimes. *Id.* at 6. The evidence establishing the materiality of

the false statements was uncontroverted and overwhelming. *See Neder*, 527 U.S. at 6, 18-20. Thus, the court had little difficulty determining the error was harmless beyond a reasonable doubt.

The United States Supreme Court requires that harmless error analysis be thorough and substantive. The appellate court must consider the error in the context of the trial as a whole. *Neder*, 527 U.S. at 19. The appellate court also must provide substantive reasoning and analysis in support of its conclusions. *See Clemons v. Mississippi*, 494 U.S. 738, 753-54, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990) (vacating state court's "cryptic holding" of harmlessness that was unsupported and "difficult to accept" without "a detailed explanation based on the record"). Requiring thorough review of the record and detailed explanation helps to ensure that harmless error review is conducted properly and consistently over time. State courts must comply with these minimum federal requirements and abide by the standards that the United States Supreme Court has established. Beyond these established federal standards and minimum requirements, states are left to develop their own concrete and detailed frameworks and standards, consistent with federal law, to govern harmless error review in state courts. *See, e.g., State v. Guloy*, 104 Wn.2d 412, 425-26, 705 P.2d 1182 (1985); *State v. Tollardo*, 2012-NMSC-8, 275 P.3d 110.

### 2. Harmless Error: Washington

Washington does not have a clear, workable, and effective legal framework to govern judicial review of constitutional errors at criminal trials. *See, e.g.,* Sweeney,

*supra*, at 287 (noting that our cases have done "little . . . to provide the analytical framework necessary to apply the doctrine of harmless error"). As a result, our adjudications of harmlessness have been unpredictable. The closest this court has come to adopting a comprehensive framework to govern harmless error review was in *Guloy*, when we intended "to settle the question of what type of standard this court will use in its harmless error analysis," and with little discussion or explanation selected "'the overwhelming untainted evidence'" test over "the contribution test." 104 Wn.2d at 425-26; *see also State v. Evans*, 96 Wn.2d 1, 6-10, 633 P.2d 83 (1981) (Brachtenbach, C.J., concurring) (discussing these two tests). Specifically, we decided that harmlessness would not depend on whether the error could have played a part in the actual jury's determination of guilt (the contribution test) and decided that harmlessness would instead depend on whether "the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt" (the overwhelming evidence test). *Guloy*, 104 Wn.2d at 426. The contribution test has since been rejected by the United States Supreme Court. *See Neder*, 527 U.S. at 11-13, 17-18. Unfortunately, the overwhelming evidence test fares little better.

The overwhelming evidence test ignores a wide variety of potential trial errors with differing effects and is an overly broad standard that properly applies in only a limited set of circumstances. First, the standard ignores that some trial errors are plausibly relevant only to discrete elements or issues. In *Neder*, for example, the jury instructions omitted one element of the crime, and that error was properly found

harmless because of uncontested and overwhelming evidence of *the omitted element*, not of guilt generally. 527 U.S. at 18. Second, the overwhelming evidence test ignores that some trial errors are not plausibly relevant to the verdict at all. For example, in *State v. Kroll*, 87 Wn.2d 829, 558 P.2d 173 (1976), the jury instructions erroneously shifted the burden of proof to the defendant as to a certain element of second degree murder but properly instructed the jury as to first degree murder. The jury convicted on first degree murder, and we rightly concluded that the error was harmless. 87 Wn.2d at 840-41. Our conclusion did not depend on any quantum of evidence because the error was not even plausibly relevant to the challenged verdict in the first place. Third, the overwhelming evidence test ignores that the amount of untainted evidence necessary to render an error harmless beyond a reasonable doubt depends upon the force with which the error plausibly might have swayed the jury toward guilt. *See Glasser v. United States*, 315 U.S. 60, 67-68, 62 S. Ct. 457, 86 L. Ed. 680 (1942). In sum, the overwhelming evidence test is appropriate only when an error is plausibly relevant to the entire verdict and might have exerted substantial force in swaying the jury toward guilt. It is probably for this reason that the United States Supreme Court originally cautioned against "overemphasis" on "'over-whelming evidence'" in harmless error review. *Chapman*, 386 U.S. at 23.

In light of the overwhelming evidence test's clear failings, it is not surprising that this court has not consistently applied it. Instead, we have frequently determined harmlessness not by weighing the error against the evidence but by considering the

limited relevance of an error to the challenged verdict. In some cases, errors have been relevant only to discrete elements or issues, and thus, in determining harmlessness we have considered only evidence related to those elements or issues. *See, e.g., State v. Watt*, 160 Wn.2d 626, 639-40, 160 P.3d 640 (2007); *State v. Thomas*, 150 Wn.2d 821, 844-45, 83 P.3d 970 (2004). In many cases, errors simply have not been plausibly relevant to the challenged verdict, and we have found those errors harmless for that reason alone, regardless of the evidence of guilt. *See, e.g., Bobenhouse*, 166 Wn.2d at 894-95; *State v. Berube*, 150 Wn.2d 498, 509, 79 P.3d 1144 (2003).[1] Thus, although we often speak of the overwhelming evidence test as if it were our universal standard for harmlessness, *see, e.g., Frost*, 160 Wn.2d at 782; *Watt*, 160 Wn.2d at 635-36; *Guloy*, 104 Wn.2d at 426, we also often ignore it. This inconsistency will continue until we identify a clear, workable, and effective framework to govern review of constitutional errors at criminal trials.

---

[1] Myriad examples exist. *See, e.g., State v. Clark*, 143 Wn.2d 731, 776, 24 P.3d 1006 (2001) ("Clark's shackling on the first day of voir dire was more than logically offset by over two weeks of observing Clark in the courtroom without shackles."); *State v. Bourgeois*, 133 Wn.2d 389, 407-08, 945 P.2d 1120 (1997) (improper communication with juror held harmless because no information was "'communicated . . . to the jury that was in any manner harmful to the appellant'" (quoting *State v. Johnson*, 56 Wn.2d 700, 709, 355 P.2d 13 (1960))); *State v. Handran*, 113 Wn.2d 11, 16, 775 P.2d 453 (1989); *State v. Caliguri*, 99 Wn.2d 501, 509, 664 P.2d 466 (1983) (tape improperly played to jury outside defendant's presence could not plausibly have been harmful notwithstanding its containing a "colorful expression of [an] agent's desire to place Caliguri under arrest, a desire which Caliguri's presence at trial must already have made the jury aware of"); *State v. Bonds*, 98 Wn.2d 1, 17-18, 653 P.2d 1024 (1982); *State v. Hall*, 95 Wn.2d 536, 539-40, 627 P.2d 101 (1981) (failure of instruction to discriminate between victims irrelevant where only evidence was of indiscriminate firing at all three alleged victims); *Kroll*, 87 Wn.2d at 840-41 (erroneous instruction related to charge upon which defendant was found not guilty).

*3. Synthesis*

The three-step framework I propose reflects existing federal standards and much of our own precedent. If adopted explicitly, this framework would provide a clear, workable, and effective way of promoting consistent and just adjudications in this difficult area of the law.

First, the reviewing court must determine whether the error warrants automatic reversal or is instead subject to constitutional harmless error analysis. *See, e.g., Gonzalez-Lopez*, 548 U.S. at 148-50 & n.4; *Frost*, 160 Wn.2d at 779-82. If an error is structural, the defendant's conviction must be reversed.

Second, if the error is subject to harmless error analysis, the State must show that the error was not plausibly relevant to the verdict. *See, e.g., Kroll*, 87 Wn.2d at 840-41. Properly determining whether and how a given type of error had the potential to sway an honest, fair-minded, and reasonable jury away from innocence and toward guilt must depend upon logic, common sense, experience, and scientific inquiry. Mere speculation is insufficient in light of the fact that "academic" and "technical" errors are the very reason the harmless error doctrine was created in the first place. *Guloy*, 104 Wn.2d at 426. Whether a given error was plausibly relevant to a particular verdict will depend upon the context of the error and often will require a searching review of the record. *See, e.g., State v. Bonds*, 98 Wn.2d 1, 17-18, 653 P.2d 1024 (1982) (jury's related finding rendered instructional error logically irrelevant); *State v. Maupin*, 128 Wn.2d 918, 929, 913 P.2d 808 (1996) (noting that "a witness's proffered

testimony [may be] so incredible that its exclusion is harmless error," but such a determination must be made "from the record"). If the court concludes, beyond a reasonable doubt, that the error was not plausibly relevant to the verdict, it must be found harmless.

Third, if the error was plausibly relevant to the verdict, the State must establish that the error could not plausibly have been the cause of a guilty verdict from an honest, fair-minded, and reasonable jury. *See, e.g., Rice*, 120 Wn.2d at 569; *Easter*, 130 Wn.2d at 242; *Watt*, 160 Wn.2d at 639-40. This step requires consideration of all relevant untainted evidence and a determination of whether eliminating the error plausibly could have tipped the scales from guilt to innocence. A searching review of the record often will be necessary. *See, e.g., State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011). The stronger the plausible sway of the error, the more compelling that the relevant untainted evidence must be. *See Glasser*, 315 U.S. at 67-68. If the error plausibly could have exerted substantial force on the jury in some way, overwhelming evidence to the same effect will be necessary to find the error harmless beyond a reasonable doubt. Some errors are egregious enough that the State will bear a significant burden persuading the court that the error did not contribute to the verdict. *See, e.g., State v. Monday*, 171 Wn.2d 667, 680-81, 257 P.3d 551 (2011). Once again, these determinations must be informed by logic, common sense, experience, and scientific inquiry. In the end, to find an error harmless, the reviewing court must be convinced, beyond a reasonable doubt, that no honest, fair-minded, and

reasonable jury plausibly would have been swayed from innocence to guilt because of the error. If an error was harmless, the conviction should not be disturbed.

Although it is unlikely that any framework will ever render harmless error analysis entirely objective and consistent, faithful adherence to this three-step process will allow for the development of useful precedent and proper adjudication of harmlessness. This is true especially because at all steps of this process, a reviewing court must provide substantive analysis and reasoning in support of its conclusions. *See Clemons*, 494 U.S. at 753-54.

### 4. Application

Reversal is improper in this case. As the majority properly notes, imposing this instruction was not structural error. Majority at 9 n.1. It was also not plausibly relevant to the guilty verdict, and clearly did not tip the scales from innocence to guilt. I am persuaded, beyond a reasonable doubt, that the error was harmless and Coristine's conviction should be upheld.

Coristine does not challenge the legal accuracy of the instruction itself. Such a challenge would not succeed; it is drawn from the pattern jury instructions and is based on the statutory language. Clerk's Papers (CP) at 20; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 19.03, at 296 (3d ed. 2008). Instructional error is generally subjected to constitutional harmless error review. *See Hedgpeth v. Pulido*, 555 U.S. 57, 60-61, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008); *State v. Jones*, 99 Wn.2d 735, 748-49, 664 P.2d 1212 (1983). Giving an

affirmative defense instruction over defendant's objection does implicate the defendant's dignity and autonomy. *See* majority at 4-5. But standing alone, it does not warrant reversal unless, at least, it plausibly might have affected the outcome of his trial.

In my view, the affirmative defense instruction simply was not plausibly relevant to the jury's verdict. The decision to give the gratuitous instruction was rendered only *after* the parties rested, and neither party so much as mentioned the affirmative defense in closing arguments. It could have had no effect on trial strategy or presentation. The instruction was a proper statement of the law. *See* RCW 9A.44.030(1). It was not misleading. It cast no doubt on the State's burden of proving Coristine's guilt beyond a reasonable doubt.

I also cannot see how this instruction might have confused the jury. *Contra* majority at 11. One can always speculate about fanciful ways that an error might have affected the final verdict. In *Kroll*, for example, we could have speculated about the jury becoming confused because of the erroneous instruction on second degree murder and then also speculated about the possible effects of that theoretical confusion on the first degree murder conviction. But such confusion would not have been plausible. We instruct jurors to consider the greater charges first before reaching the lesser degree. *E.g.,* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 155.00, at 626 (3d ed. 2008). Since the jurors convicted on the greater charge, they would not have reached the lesser and any chance of

confusion would have been so remote as to be dismissed beyond a reasonable doubt. In contrast, as a result of the forced insanity defense, there was an actual conflict between Jones's defense and the defense forced upon him, and potentially damaging psychiatric evidence was admitted. *Jones*, 99 Wn.2d at 748-50.

Nothing like what happened in *Jones* happened here. There simply was no conflict between the statutory affirmative defense that "the defendant reasonably believed that [the victim] was not mentally incapacitated," CP at 20, and the defendant's theory of the case that the victim was *not* mentally incapacitated. If the jurors had found that "the defendant reasonably believed that [the victim] was not mentally incapacitated or physically helpless," "it [was their] duty to return a verdict of not guilty." CP at 20. If the jurors concluded the state had *not* "proved beyond a reasonable doubt" that the victim "was incapable of consent by reason of being physically helpless or mentally incapacitated," it was their "duty to return a verdict of not guilty." CP at 16. If anything, the affirmative defense instruction helped Coristine by giving the jury another way to acquit him. We can say—we should say—that we are confident, beyond a reasonable doubt, that the improper instruction did not contribute to the verdict.

The actual evidence presented in this case confirms this. The rape took place at Coristine's residence. His victim had just moved in and was one of many roommates. L.F. testified that she drank heavily at the party and went to bed when her head began to "spin[ ]." 2 Verbatim Report of Proceedings (VRP) at 92. The following day, L.F.

went to the hospital and reported to a nurse and police officer that she had been raped while "in and out of a conscious state" while intoxicated in her own bed. 2 VRP at 182. L.F. testified that Coristine subsequently called her at the hospital and told her "I think it was me, I'm sorry." *Id.* at 108. Coristine allegedly explained that he had been "really drunk" and asked L.F. not to tell his wife. *Id.* L.F. moved out of the house the next day.

When a detective interviewed him, Coristine admitted he had talked to L.F. on the phone while she was at the hospital, but he denied making self-incriminating statements. At the same time, he told the detective that he was very intoxicated at the party and that he remained unsure of what he had done. Coristine's DNA (deoxyribonucleic acid) was retrieved from L.F.'s body.

At trial, Coristine testified that he initially did not remember having sex with L.F. but that "after a couple days [he] did remember everything." 3 VRP at 358, 380. He testified that when he came upstairs after the party in response to a noise, L.F. pulled him into her bedroom and goaded him into having sex with her. *Id.* at 354-55 ("I was kind of intoxicated but I still had a level head, but I kind of lost my balance and fell into the room."). Coristine testified that he did not resist for fear of hurting L.F. and that he did not call out for help because he assumed they were making enough noise in the doorway for someone to hear. Coristine's sister-in-law testified that she was awake at the time and in her bedroom across the hall, but she did not hear any noise from L.F.'s room.

The record as a whole clearly demonstrates Coristine's guilt. His version of events was implausible and self-serving. Numerous inconsistencies and farfetched allegations riddled Coristine's testimony. He acknowledged that L.F. had gone to sleep for the night but then alleged that she later grabbed him and physically forced him into her room. Coristine's assertion that he could not physically resist L.F.'s advances without injuring her defies common sense. Coristine also alleged he did not call for help because he and L.F. were making a lot of noise—an explanation which is dubious on its own and flatly was contradicted by the testimony of a third party. Beyond a reasonable doubt, the error did not contribute to the verdict.

There will be real consequences to the court's decision today. L.F. already had to endure the trial and testify; she should not have to do so again, and she may not be able to do so again. *See* 2 VRP at 88 ("[I]t's something I've tried really, really hard to block out as best I can. . . . Last night things came back to me that I didn't want to come back."). There is no guarantee that other relevant witnesses will be available or remain able to recall relevant details. In either case, the resources expended at the first trial will have been needlessly wasted. Our constitution does not demand this result.

I respectfully dissent.

Gonzádlez, J