# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51037-5-II |
| Respondent, | |
| v. | |
| CARLOS JERMAINE HULL, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, P.J. — Carlos Hull appeals his convictions for assault in the first degree (two counts), assault in the second degree, and unlawful possession of a firearm in the first degree. The assault convictions included firearm enhancements. The convictions arose out of a nighttime shooting which left three people seriously injured.

Hull argues that the State's eyewitnesses misidentified him and that the court erred by instructing the jury on the reliability of eyewitness identification testimony, which included a factor regarding "the witness's familiarity or lack of familiarity with people of the perceived race or ethnicity of the perpetrator of the act." Clerks Papers (CP) at 83. He contends that the jury instruction constituted a comment on the evidence. He also argues that the court abused its discretion by giving the instruction and that the instruction violated his rights under the Sixth Amendment of the United States Constitution.

We affirm.

## FACTS

One evening, Brandon Walker, Shane Giannini, and Randy Stone went to a sports bar in Tacoma. Hull and a group of friends also went to the bar. Walker and his friends are white. Hull and his friends are black.[1]

As Walker, Giannini, and Stone left the bar and went to the parking lot, a verbal confrontation occurred between the two groups. Shortly thereafter, it appeared the two groups made amends, and Walker, Giannini, and Stone turned to leave. Then, someone, later identified as Hull, hit Walker in the back of the head with either his fist or a pistol. The hit knocked Walker unconscious.

The assailant[2] then fired a gun at Stone, hitting him with multiple bullets, including one in his right arm, one in his left hip, and one in his left femur. One of the bullets went through Stone and struck Giannini in the right arm.

The police arrived shortly thereafter. They accessed two surveillance videos from the night of the incidents. One video showed the entry way inside the bar.

Tony Chambers, the manager of a nearby business, Rachel Kershaw, a server at the bar, and Jermaine Berry, a cook at the bar, witnessed the incident. Chambers and Berry are black; Kershaw is white.

---

[1] The legal issue in this case involves a jury instruction that discussed, among other factors, how the reliability of eyewitness identification is affected by whether the eyewitness is of the same or different race or ethnicity than the defendant. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.52, at 212 (4th ed. 2016) (WPIC). Thus, the witnesses' and defendant's race or ethnicity are relevant. We recognize that different terms were used to describe people's race or ethnicity at trial. We use prevailing terminology and intend no disrespect.

[2] Two of the three eyewitnesses testified that the shooter was the same person as the one who hit Walker.

Chambers described the assailant as approximately 6 feet 2 inches to 6 feet 3 inches. He had braids that did not reach down to his shoulders. He wore all-blue sweats, both pants and top, and Jordan-brand shoes.

Shortly after the shooting, the police arrived. They asked Chambers if he could identify the assailant. After being shown surveillance footage, Chambers pointed out the assailant to the police.

Kershaw witnessed the incidents while standing in the bar's beer garden. Kershaw smoked marijuana with the assailant shortly before the assaults. While smoking, the shooter pulled a gun out of his sweat pants. Kershaw backed away and told him to put the gun away. The shooter then approached a group of white males in the parking lot and put the gun back into his sweat pants.

Kershaw saw approximately 15 black males in the parking lot. Kershaw observed the assailant hit one of the white men on the back of the head with either his fist or a gun and then fire on the other men. After the gunshots, Kershaw ran inside. She did not see the assailant leave the scene.

Kershaw described the assailant as a "[t]all, African American male . . . wearing blue sweat pants and [a] matching sweat hoodie." Report of Proceedings (RP) (July 11, 2017) at 32. He was approximately 6 feet tall and weighed close to 180 pounds. He had a gap in his front teeth. His hair was in "little twisty or braids" that were "a couple inches long." RP (July 11, 2017) at 34.

Berry worked at the bar the night of the assaults. After finishing work, Berry drank a beer in the bar's beer garden. Berry heard a "loud pop." 5 RP at 362. He turned around and saw fighting. Berry saw the assailant pull a gun from his waistband and begin shooting.

Berry then saw the assailant exit the parking lot, driving alone in a silver Chevrolet Impala. The car had silver rims and no window tint. Approximately five months after the assaults, a Pierce

3

County sheriff pulled over Hull driving a silver 2007 Chevrolet Impala, which "had tire rims that were silver in color, and it had no tinting on the windows." CP at 75. The car was registered to Hull's mother.

Berry described the shooter as approximately 6 feet 1 inch to 6 feet 2 inches. He had short braids that did not reach his shoulders. He wore a navy blue or black sweater.

Approximately seven months after the incident, the police separately showed Chambers and Berry the same photo montage. It included Hull and five other individuals. Neither Chambers nor Berry identified Hull. The police never showed Kershaw the photo montage.

From the bar's surveillance video that the police had accessed, they generated still images. Approximately 10 months after the incident, the police interviewed Hull and showed him the stills. Hull identified himself as the same person Chambers had identified as the shooter.

The State charged Hull with two counts of assault in the first degree, one count of assault in the second degree, and unlawful possession of a firearm in the first degree. The assault charges carried firearm enhancements.

Hull pleaded not guilty and proceeded to trial.

Walker, Giannini, and Stone all testified but none made an in-court identification of the assailant.

However, Chambers, Kershaw, and Berry all identified the shooter on the surveillance video when they reviewed it during trial. Chambers was "[p]ositive" that the person he identified was the assailant. 4 RP at 252. Kershaw was "[c]ompletely certain" that the person she pointed out in the video was the assailant. RP (July 11, 2017) at 70. Berry was 100 percent certain that the person he identified in the video was the assailant.

Hull denied having any involvement in an altercation on the evening of the assaults. He stated that he went to the sports bar, shared a shot of tequila with Stone, and then left in a friend's vehicle. He further stated that he did not have access to his mother's Chevrolet Impala on the date of the incident.

As relevant, the court instructed the jury:

> Eyewitness testimony has been received in this trial on the subject of the identity of the perpetrator of the crime charged. In determining the weight to be given to eyewitness identification testimony, in addition to the factors already given you for evaluating any witness's testimony, you may consider other factors that bear on the accuracy of the identification. These may include:
> - The witness's capacity for observation, recall and identification;
> - The opportunity of the witness to observe the alleged criminal act and the perpetrator of that act;
> - The emotional state of the witness at the time of the observation;
> - The witness's ability, following the observation, to provide a description of the perpetrator of the act;
> - The witness's familiarity or lack of familiarity with people of the perceived race or ethnicity of the perpetrator of the act;
> - The period of time between the alleged criminal act and the witness's identification;
> - The extent to which any outside influences or circumstances may have affected the witness's impressions or recollection; and
> - Any other factor relevant to this question.

CP at 83 (Instr. 4). The State proposed this instruction, and Hull excepted to the court giving it. This instruction was a verbatim copy of 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.52, at 212 (4th ed. 2016) (WPIC).

Hull argued in closing that this case was entirely about misidentification. He argued that the shooter was misidentified in the video, as evidenced by Chambers's, Kershaw's, and Berry's inconsistent descriptions of the shooter. He argued that Chambers's and Berry's photo montage misidentifications further indicated that their identifications were unreliable.

In its rebuttal closing, the State relied on instruction 4 to argue that because Hull, Chambers, and Berry are all black, Chambers's and Berry's identifications of Hull are reliable.

5

The jury found Hull guilty on all counts. CP at 110-16. The jury returned special verdicts finding Hull guilty of firearm enhancements for his assault convictions.

The court sentenced Hull to 365 months of confinement. Hull appeals.

ANALYSIS

I.      NO COMMENT ON THE EVIDENCE

Hull argues that the court impermissibly commented on the evidence by giving instruction 4. We disagree.

We review jury instructions de novo to determine whether the trial court improperly commented on the evidence. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. "A jury instruction that does no more than accurately state the law pertaining to an issue . . . does not constitute an impermissible comment on the evidence." *State v. Woods*, 143 Wn.2d 561, 591, 23 P.3d 1046 (2001). However, an instruction that could lead the jury to infer that the trial court believed or disbelieved a witness constitutes an impermissible comment on the evidence. *State v. Faucett*, 22 Wn. App. 869, 876, 593 P.2d 559 (1979).

In *State v. Allen*, 161 Wn. App. 727, 744-45, 255 P.3d 784 (2011), *aff'd*, 176 Wn.2d 611, 294 P.3d 679 (2013), the court recognized that properly drafted jury instructions cautioning juries about the potential unreliability of cross-racial eyewitness identification are not comments on the evidence. The court relied on *State v. Carothers*, 84 Wn.2d 256, 525 P.2d 731 (1974), *disapproved on other grounds by State v. Harris*, 102 Wn.2d 148, 685 P.2d 584 (1984).

*Carothers* analyzed whether the court impermissibly commented on the evidence when it instructed the jury about the testimony of an accomplice.

An instruction to view the testimony of an accomplice with caution is an indication not of the judge's attitude toward the testimony of a particular witness, but of the attitude of the courts generally toward the testimony of witnesses of this type. It is an attitude which has been garnered from many years of observation of the prosecutorial process. The courts have an expertise upon this subject, which the ordinary citizen cannot be expected to have. They have observed that innocent persons may be sent to prison or to death upon the testimony of an accomplice. At the same time such testimony is not invariably false and it may be the only proof available.

*Carothers*, 84 Wn.2d at 267-68.

In *Allen*, the court recognized that "[t]he rationale applied in *Carothers* could apply in equal force to a cross-racial eyewitness identification instruction." *Allen*, 161 Wn. App. at 745.

In a splintered opinion, the Supreme Court affirmed. *Allen*, 176 Wn.2d at 632. All nine justices agreed that, in certain circumstances, cross-racial identification jury instructions may be appropriate. *Allen*, 176 Wn.2d at 624 (plurality opinion); 176 Wn.2d at 632 (Madsen, C.J., concurring); 176 Wn.2d at 634 (Chambers, J., concurring); 176 Wn.2d at 635-36 (Wiggins, J., dissenting).

Here, the court's instruction 4 was modeled in response to the Supreme Court's unanimous support for such instructions. *See* WPIC 6.52 cmt. at 213. The model jury instruction was based upon a California jury instruction cited in *Allen*. 176 Wn.2d at 617 n.3; WPIC 6.52 cmt. at 213. The Washington Supreme Court Committee on Jury Instructions then modified the California instruction "[w]ith a view to juror comprehension and neutrality of phrasing, and [to comply with] Washington's prohibition on judicial comments on the evidence." WPIC 6.52 cmt. at 213.

Because instruction 4 was "an indication not of the judge's attitude toward the testimony of a particular witness, but of the attitude of the court[] generally toward the testimony of witnesses of this type," we conclude that the trial court did not impermissibly comment on the evidence. *Carothers*, 84 Wn.2d at 268.

7

II.      NO ABUSE OF DISCRETION

Hull argues that the trial court erred in giving instruction 4 because no "eyewitness identification testimony" existed and thus the evidence did not support the instruction. Br. of Appellant at 13.[3] We disagree.

Jury instructions are appropriate if they allow the parties to argue their theory of the case, do not mislead the jury, and do not misstate the law. *State v. Stevens*, 158 Wn.2d 304, 308, 143 P.3d 817 (2006). We review de novo whether the jury instructions adequately state the applicable law. *Stevens*, 158 Wn.2d at 308.

We review whether evidence supports giving a jury instruction for an abuse of discretion. *State v. Walker*, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998); *State v. Green*, 182 Wn. App. 133, 152, 328 P.3d 988 (2014). A trial court abuses its discretion only where its decision is manifestly unreasonable or based on untenable reasons. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001). A party is entitled to a jury instruction on a theory of the case when evidence exists in the record to support the party's theory. *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). A party is not entitled to an instruction that is not supported by the evidence. *Hughes*, 106 Wn.2d at 191.

We conclude that Chambers's, Kershaw's, and Berry's testimonies constituted "eyewitness identification testimony." "Eyewitness identification" is defined as: "A naming or description by which one who has seen an event testifies from memory about the person or persons involved." BLACK'S LAW DICTIONARY 626 (8th ed. 2004).

---

[3] Hull also argues that that the court erred by giving the instruction because WPIC 6.52 was crafted to caution juries about the unreliability of cross-racial eyewitness identifications, not to bolster the reliability of same-race eyewitness identification, as the instruction was used here. The State argues that the proper framework for Hull's argument is a claim of prosecutorial misconduct. We agree with the State.

Clearly, the testimony of Chambers, Kershaw, and Berry all described the incident based on their memories of it. They described the man who assaulted Walker, and who shot Stone and Giannini. They identified the shooter on the bar's surveillance video. It is immaterial that no in-court identification occurred because Hull admitted he was the man the witnesses identified in the video.

Based on the facts presented here, and after reviewing the court's instruction to the jury, we also conclude that the evidence supported giving the instruction.

Relevant factors for the jury to consider included:

- The witness's capacity for observation, recall and identification;
- The opportunity of the witness to observe the alleged criminal act and the perpetrator of that act;
- The emotional state of the witness at the time of the observation;
- The witness's ability, following the observation, to provide a description of the perpetrator of the act;
- The witness's familiarity or lack of familiarity with people of the perceived race or ethnicity of the perpetrator of the act;
- The period of time between the alleged criminal act and the witness's identification;
- The extent to which any outside influences or circumstances may have affected the witness's impressions or recollection; and
- Any other factor relevant to this question.

CP at 83.

The following summary of the evidence demonstrates the relevance to the various factors. Kershaw admitted to smoking marijuana shortly before the incident. Berry admitted to drinking alcohol at the time he witnessed the incident.

Kershaw and Berry observed the incident from the bar's beer garden, approximately 50 feet away from the assaults. Kershaw discussed how her eyesight diminishes when objects are further than five feet away. She also was not wearing glasses on the night of the incident.

Chambers observed the incident while standing by the front door of the bar. Shortly after the incident, Chambers reviewed the surveillance video and identified the shooter to the police.

Chambers and Berry are the same race as Hull. Kershaw is not.

Chambers and Berry made misidentifications when shown photo montages seven months after the incident. Trial occurred approximately 23 months after the incident.

Each of the above facts were relevant to one or more factors contained in instruction 4. Thus, the evidence supported the instruction, and the trial court did not abuse its discretion.

III.     SIXTH AMENDMENT

Hull argues that the trial court violated his Sixth Amendment right to control strategic decisions in his case by giving instruction 4 over his objection. We disagree.

The Sixth Amendment to the United States Constitution precludes interfering with a defendant's autonomy to present a defense. *State v. Coristine*, 177 Wn.2d 370, 375, 300 P.3d 400 (2013). To respect the defendant's dignity and autonomy, the Sixth Amendment recognizes the defendant's right to control important strategic decisions. *McKaskle v. Wiggins*, 465 U.S. 168, 176-77, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); *Coristine*, 177 Wn.2d at 376.

Hull relies on *Coristine* for support. In *Coristine*, the defendant did not propose the "reasonable belief" affirmative defense instruction to his rape in the second degree charge. 177 Wn.2d at 374. The court gave the instruction over his objection. *Coristine*, 177 Wn.2d at 374. The jury found the defendant guilty, and the defendant appealed. *Coristine*, 177 Wn.2d at 375.

The court held that "[i]nstructing the jury to consider an affirmative defense over the defendant's objection interferes with the accused's right to present a chosen defense." *Coristine*, 177 Wn.2d at 378. Therefore, the court concluded that "[b]ecause [the defendant] validly waived

his right to mount a reasonable belief affirmative defense, the trial court violated his Sixth Amendment rights when it failed to respect his decision." *Coristine*, 177 Wn.2d at 379.

Hull misinterprets *Coristine*. He relies on the following quote, "'the defendant's right to control important strategic decisions,'" but interprets it too broadly. Br. of Appellant at 11 (quoting *Coristine*, 177 Wn.2d at 376). *Coristine* only recognized that

> [a]n affirmative defense places a burden of proof on the defendant, thus shaping the defense by introducing elements it must prove. This process may influence a wide range of strategic trial decisions, such as who is called to testify, the questions asked on direct and cross-examination, and what arguments are made in summation.

177 Wn.2d at 378. Therefore, the court concluded that "the decision to offer an affirmative defense cannot be forced on an unwilling defendant" because "[t]he Sixth Amendment places this important strategic decision squarely in the hands of the defendant, not the prosecutor or the trial court." *Coristine*, 177 Wn.2d at 378.

*Coristine* is distinguishable from the present case. Most importantly, in *Coristine*, the issue involved the giving of an affirmative defense jury instruction over the defendant's objection.

Here, the jury instruction at issue did not involve an affirmative defense that Hull had not chosen to assert. The instruction did not place a burden of proof on Hull. Rather, the instruction told the jury factors it could consider in evaluating the reliability of eyewitness identification testimony. Hull fails to show how giving instruction 4 over his objection rises to a similar level of implicating important strategic trial decisions.

We conclude that giving instruction 4 over Hull's objection did not implicate the type of important strategic decisions at issue in *Coristine*. Therefore, we conclude that instruction 4 did not violate Hull's rights under the Sixth Amendment.

11

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, P.J.

We concur:

Sutton, J.

Glasgow, J.