# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47246-5-II |
| Respondent and Cross-Appellant, | |
| v. | |
| ADAM PAUL RAMBUR, | UNPUBLISHED OPINION |
| Appellant and Cross-Respondent. | |

JOHANSON, J. — Although convicted of several offenses, Adam Rambur appeals only his conviction of unlawful imprisonment and the imposition of legal financial obligations (LFOs). We hold that (1) the trial court did not abuse its discretion when it sustained the hearsay objection, (2) Rambur's counsel was not ineffective for failing to propose a lawful use of force instruction, (3) any prosecutorial misconduct was harmless, and (4) the trial court adequately assessed Rambur's ability to pay his LFOs. Addressing the State's cross appeal, we also hold that the trial court erred when calculating Rambur's offender score. Thus, we affirm Rambur's unlawful imprisonment conviction, reverse his sentence, and remand for resentencing.

## FACTS

### I. BACKGROUND FACTS

Sara Cypher and Rambur lived together. In September 2014, Cypher called 911. During the call, Cypher cried, saying, "[H]e's gonna kill me. I have the doors locked right now and he

walked into the woods . . . he's gonna kill me." Ex. 10 at 1. She also explained that after she and Rambur argued for three hours, he broke her phone, hit her, choked her, and almost broke her wrist. Cypher said Rambur threatened to kill her, to hurt her dog, and to hit her in the head with a hammer. Afterward, Rambur walked into the woods and Cypher locked the doors. Cypher reported bruises on her arms and chest caused by Rambur's hands.

Lewis County Sheriff's Deputies Susan Shannon and Jeff Humphrey arrived at the scene. Both deputies spoke to Cypher and observed that she was upset, afraid, and frantic. Cypher told Deputy Shannon about the argument and the assault and strangulation in some detail. Deputy Humphrey saw bruises on Cypher's upper arms, some fingerprint marks, and redness around her forearms and wrists. Deputy Shannon also saw marks on Cypher's forearms and wrists. Cypher refused to be photographed or to give a tape-recorded statement.

The deputies eventually arrested Rambur at the scene. After *Miranda*[1] warnings, Rambur waived his rights and told Deputy Shannon that after a domestic dispute with Cypher, he put her on the ground, sat on top of her with his knees on her shoulders, and grabbed her forearms and wrists to hold them over her head. He denied choking, face slapping, or threatening to kill Cypher. Rambur said Cypher was threatening to break, throw, and burn items.

## II. PROCEDURE AND TRIAL

The State ultimately charged Rambur with second degree assault by strangulation or suffocation, unlawful imprisonment, felony harassment, and bail jumping. At trial, the State called three witnesses: Cypher, Deputy Shannon, and Deputy Humphrey.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Cypher's trial testimony differed substantially from the statements she made on the 911 call and to the deputies on the night of the incident. Cypher testified that she woke in a bad mood and instigated a fight with Rambur. While they argued, both Rambur and Cypher threw household items, including paintings, at the walls and onto the floor. Cypher threw an ashtray that shattered a glass light fixture. Cypher nearly walked on the glass to reach more items to break, but Rambur pushed against her body with his chest to guide her into the living room.

In the living room, Cypher grabbed Rambur and pulled him down so they fell onto the floor. Rambur sat on top of her, with his legs on either side of her, and held her arms below her wrists over her head. Cypher struggled to get up. Cypher testified that while Rambur held her down, she was "trying to get up to break more things, and he had to hold me down," and when he let her go, she attempted to break more things. 1 Report of Proceedings (RP) at 66.

She also testified that Rambur did not hurt her when he held her down, he was calmly talking to her, and he was trying to calm her down to prevent her from breaking more items and from walking on the broken glass. Cypher stated that Rambur held her down for 10 to 15 minutes and that her movement was restricted without her consent such that she could not get up.

Rambur let Cypher up when she "trick[ed] him . . ., to make him think" she had calmed down. 1 RP at 69. Cypher said she was going to call her mom and Rambur took her phone from her hands and threw it on the ground, breaking it. Rambur walked outside "calmly," and Cypher called 911. 1 RP at 73.

On the stand, Cypher acknowledged that she did not tell the deputies that she started the argument with Rambur or that she was throwing things and that she did not try to tell the deputies that she lied to the 911 operator. Cypher testified that she did not tell them those things because

"[a]s soon as [the deputies] told [her] that [Rambur] was going to jail, then [she] knew that [she'd] made a very bad mistake, and so [she] did not tell them any more." 1 RP at 97. She denied that Rambur threatened to kill her or hit her on the head with a hammer and denied that he assaulted, choked, or hit her.

Cypher testified that she made up these allegations because she wanted the police to make him leave, and she figured she had to make big accusations. She stated that she could not breathe because she was panicking, "crying and acting crazy," not because Rambur choked her. 1 RP at 102. Cypher testified that the bruises on her arm came from routinely assisting a large resident at her job as a caregiver. Cypher also testified that she wrote, but never sent, a letter to the court apologizing for lying and making the false allegations.

Deputies Shannon and Humphrey testified to the facts set out above in the background facts. Additionally, during direct examination, Deputy Shannon testified to the following:

> A     Mr. Adam Rambur stated that he was in a domestic dispute with Sara Cypher, that he had put her on the ground, that he was sitting on top of her with the knees on her shoulders, and that he had grabbed her forearms and wrists and held them over her head.
> Q     Did he indicate whether they had been throwing anything?
> A     He said that Ms. Cypher was threatening to break items, throw items, and burn items.
> Q     So she had been threatening to do that, but she hadn't quite done that yet?
> A     Right. I asked him specifically, "Well did she break anything?" And his response was, "No, she was just threatening to do so."

2 RP at 158-59.

The following exchange then occurred during cross-examination of Deputy Shannon:

> Q     Deputy, in your report you indicate that Mr. Rambur stated that Ms. Cypher was acting crazy and he was just trying to keep her from attacking him?
> [STATE]: Objection, Your Honor.
> Q     Is that in your report?
> [STATE]: Hearsay.

4

THE COURT: I'll sustain that.

2 RP at 159-60. Defense counsel did not ask to be heard regarding the State's objection. He simply asked Deputy Shannon questions unrelated to her report.

Deputy Humphrey testified that Cypher told him that Rambur pinned her down and that during the altercation some property was potentially damaged. He also stated that Rambur admitted to pinning her down. Deputy Humphrey said Rambur reported that Cypher threatened to damage paintings.

After Deputy Humphrey's testimony and the introduction of exhibits, the State rested. Without calling any witnesses, defense rested. Defense counsel did not request a jury instruction related to defense of self, others, or property. During rebuttal closing argument, the prosecutor made the following remarks followed by an objection from defense counsel:

> [STATE]: Counsel said, "Well, see, all you have is Sara Cypher. That's all she said." That's not all you have. You have what she said in the 911 call. You have what she told law enforcement again when they appeared, and you have the physical marks on her arms.
> Now, counsel makes a big deal about, well, the deputies didn't really describe the bruising and the marks. I leave it to you to decide whether the testimony was there, because I believe Sue Shannon, Deputy Shannon.
> [DEFENSE]: Objection.
> THE COURT: Sustained. Disregard that comment. Strike that from the record.
> [STATE]: I wasn't finished with my statement.
> [DEFENSE]: Can I take up the motion now or later?
> THE COURT: Later.

2 RP at 246-47.

After the State's rebuttal argument, Rambur moved for a mistrial arguing that the prosecutor's statement of "I believe Sue Shannon" was a personal attestation and striking the

5

statement from the record was insufficient to cure the resulting prejudice. 2 RP at 256. The court denied the motion.

The jury found Rambur guilty of unlawful imprisonment, bail jumping, and fourth degree assault. The jury found Rambur not guilty of felony harassment. The jury also found Rambur and Cypher were members of the same household, making the assault and unlawful imprisonment charges domestic violence crimes. Rambur appeals only the unlawful imprisonment conviction.

### III. SENTENCING

The State argued that Rambur's offender score was two—one point for the assault as a repetitive domestic violence offense and one point for the bail jump—for a standard range for the unlawful imprisonment conviction of four to twelve months and a recommended sentence of six months for all convictions. Rambur argued that the assault was not a repetitive domestic violence offense under RCW 9.94A.525(21)(c). Rambur requested three months, within the standard range of three to eight months for an unlawful imprisonment conviction with one offender point.

The court ruled that the assault did not count as a point towards Rambur's offender score and stated the following regarding the offender score and sentence:

> Be the judgment of the Court, with respect to the count 2, Unlawful Imprisonment, I find the offender score to be one. *It really makes no difference.* It gives a standard range of three to eight months. With respect to sentence, on Count 2, Unlawful Imprisonment, five months, credit for three days.

3 RP at 277-78 (emphasis added). The court imposed five months of confinement for each of the three convictions to be served concurrently for a total of five months.

The State specifically asked the court to find that Rambur had the means to pay for the costs of his incarceration and requested that he pay several legal fees. Rambur did not object, but noted that while he worked "doing home improvement" to pay his rent, he has a health condition

that is a "significant impairment to working." 3 RP at 273. The court imposed a total of $3,718.20 in LFOs to be paid at $30.00 per month starting 60 days from Rambur's release from jail.

Rambur appeals his conviction for unlawful imprisonment and the LFOs. The State cross appeals the calculation of Rambur's offender score.

## ANALYSIS

### I. HEARSAY OBJECTION

Rambur argues that the trial court denied him his constitutional right to a fair trial when it sustained the State's hearsay objection, preventing Deputy Shannon's testimony regarding Rambur's statements that he restrained Cypher to keep her from attacking him or destroying his property. We disagree.

### A. STANDARD OF REVIEW AND RULES OF LAW

The right to confront and cross-examine adverse witnesses is guaranteed by both the federal and state constitutions. *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002) (citing *Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)). The right to present testimony of witnesses provides the defendant with the ability to rebut the prosecution's case, but the use of that right by a defendant requires deliberate planning and affirmative conduct. *Taylor v. Illinois*, 484 U.S. 400, 411, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).

Typically, we review a claim of a denial of a fair trial and the right to present a defense de novo. *State v. Iniguez*, 167 Wn.2d 273, 280-81, 217 P.3d 768 (2009); *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). However, a defendant does not have an absolute right to cross-examination and it is within the trial court's sound discretion to limit the scope of cross-examination. *Darden*, 145 Wn.2d at 620-21. Indeed, a trial judge has considerable latitude when

7

ruling on the propriety of admitting evidence, particularly for cross-examination or for impeachment purposes. *Roper v. Mabry*, 15 Wn. App. 819, 822, 551 P.2d 1381 (1976). Thus, we review a trial court's decision to limit cross-examination of a witness for abuse of discretion. *State v. Aguirre*, 168 Wn.2d 350, 361-62, 229 P.3d 669 (2010). A trial court abuses its discretion when it bases its decision on unreasonable or untenable grounds. *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009).

### B. IMPEACHMENT WITH PRIOR INCONSISTENT STATEMENT

While Rambur had the right to confront and cross-examine Deputy Shannon, that right is not absolute. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Darden*, 145 Wn.2d at 620-21. As the State correctly argues, the use of that right requires affirmative conduct by the defendant and, following the State's hearsay objection, Rambur did not explain to the trial court that he was attempting to impeach Deputy Shannon; instead, he simply moved on to the next question. *Taylor*, 484 U.S. at 410.

Because Rambur did not tell the court that he intended to impeach Deputy Shannon, the trial court reasonably concluded that Rambur instead intended to enter his self-serving hearsay statement through Deputy Shannon to support his theories of self-defense and defense of property. Thus, the trial court did not abuse its discretion when it sustained the State's hearsay objection, but rather it properly limited the scope of cross-examination. *Darden*, 145 Wn.2d at 620-21.

### C. COMPLETENESS DOCTRINE

Alternatively, Rambur argues that the trial court erred because Shannon's testimony was admissible under ER 106, the rule of completeness. But at trial, Rambur did not argue that Deputy Shannon's testimony was admissible under ER 106. Thus, this argument fails for the same reasons

stated in the previous section—the trial court did not abuse its discretion when it sustained the hearsay objection in light of the fact that Rambur did not raise this argument at trial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Rambur argues that his counsel was ineffective when he failed to request a lawful use of force jury instruction related to the charge of unlawful imprisonment under RCW 9A.40.040. We disagree.

### A. STANDARD OF REVIEW AND RULES OF LAW

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Darden*, 145 Wn.2d at 620. The Sixth Amendment also guarantees the right to control one's defense, which encompasses the decision to present an affirmative defense. *State v. Coristine*, 177 Wn.2d 370, 376, 300 P.3d 400 (2013). An attorney's failure to recognize and raise an affirmative defense can fall below the constitutional minimum for effective representation, but determining whether an attorney was ineffective requires review of whether the record confirms a valid strategic decision. *Coristine*, 177 Wn.2d at 379.

Under the *Strickland* test to determine if counsel was effective, the defendant bears the burden to show (1) counsel's performance was deficient and (2) the attorney's deficient performance prejudiced the defense. 466 U.S. at 687. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Strickland*, 466 U.S. at 700.

Performance is deficient if it falls "below an objective standard of reasonableness" given all of the circumstances. *Strickland*, 466 U.S. at 688. There is a strong presumption that counsel's performance was reasonable given the deference afforded to decisions of defense counsel in the course of representation. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Counsel's conduct is not deficient if it can be characterized as a legitimate trial strategy, but the relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *Grier*, 171 Wn.2d at 33-34. A defendant is prejudiced by deficient assistance if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

A person is guilty of unlawful imprisonment if "he or she knowingly restrains another person." RCW 9A.40.040. "Restrain" as used in the statute means to "restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty [while r]estraint is 'without consent' if it is accomplished by (a) physical force." RCW 9A.40.010(6), .040.

> The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
>     . . . .
>     (3)Whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary.

RCW 9A.16.020.

Each party is entitled to have his theory of the case presented to the jury by proper instructions if there is any evidence to support the theory. *State v. Adams*, 31 Wn. App. 393, 395, 641 P.2d 1207 (1982). Thus, we review a claim of ineffective assistance of counsel based on

10

failure to request a lawful use of force defense instruction by determining first whether there was credible evidence tending to establish the defendant acted in self-defense and by analogy in defense of another or of property such that defendant was entitled to the instruction. *State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998). Second, if the defendant was entitled to the instruction, we review whether or not it was a legitimate, reasonable trial tactic for defense counsel to decline to request the defense instruction. *Grier*, 171 Wn.2d at 33-34.

## B. DEFENSE OF OTHERS

Rambur argues that his counsel was ineffective because he did not request a lawful use of force instruction under RCW 9A.16.020(3) and he was entitled to that instruction because he acted lawfully to protect Cypher from harm. We disagree.

RCW 9A.16.020(3) entitles a person to use physical force to protect a third party from "an offense against his or her person," which implicates an intentional act of force, such as an assault. Rambur does not cite to particular facts to support his theory of defense from Cypher; instead, he relies on Cypher's testimony generally. From our review of the facts, we find one possible theory that rests on Cypher's testimony that Rambur blocked her with his body to prevent her from walking on glass. But protecting Cypher from the possibility that she may walk on broken glass is not protecting her from an "offense against his or her person" from an act of force.[2] RCW 9A.16.020(3). Because there are no facts that would support that Rambur was protecting her from an "offense against his or her person," Rambur was not entitled to a jury instruction under RCW 9A.16.020(3). *Adams*, 31 Wn. App. at 395.

---

[2] An "offense" is a crime, and a "crime" is defined as an "act that the law makes punishable." BLACK'S LAW DICTIONARY 451 (10th ed. 2014).

And because Rambur would not have received a jury instruction regarding lawful use of force to protect another, it was reasonable that his defense counsel did not request said instruction. *Strickland*, 466 U.S. at 688. Thus, Rambur's counsel was not deficient for not requesting an instruction regarding defense of another.

### C.  SELF-DEFENSE

Rambur argues that his counsel was ineffective when he did not request a lawful use of force instruction under RCW 9A.16.020(3) because Rambur acted in self-defense. This argument also fails.

Under RCW 9A.16.020, use of force against another is not unlawful if used by a party "about to be injured" and as long as "the force [used] is not more than is necessary." RCW 9A.16.020(3). To be entitled to present a self-defense instruction to the jury, a defendant must produce some evidence that tends to prove he acted in self-defense. *Walker*, 136 Wn.2d at 772. One of the elements of self-defense is that the person relying on the self-defense claim must have had a reasonable apprehension of great bodily harm. *Walker*, 136 Wn.2d at 772.

Here, Cypher testified that she grabbed on to and pulled Rambur on top of her while they were arguing. Cypher testified that after she pulled Rambur on top of her, "then I was trying to get up to break more things, and he had to hold me down." 1 RP at 66. And Cypher testified that Rambur held her down by her wrists for 10 to 15 minutes such that she could not get up despite struggling and until he let her get up.

This was the only evidence that Cypher used physical force against Rambur's person. Rambur did not testify at trial, and no one testified that Rambur was "about to be injured" or reasonably believed he was in danger of bodily harm from Cypher. RCW 9A.16.020(3). Because

Rambur did not sustain his burden to produce evidence showing that he had a good faith belief in the necessity of force to protect himself when he held Cypher down or that his belief was objectionably reasonable, Rambur was not entitled to a jury instruction on self-defense.

Because Rambur was not entitled to present a jury instruction regarding self-defense, it was reasonable that his defense counsel did not request said instruction. *Strickland*, 466 U.S. at 688. Thus, Rambur's counsel was not deficient for not requesting an instruction regarding lawful use of force in self-defense.

## D. DEFENSE OF PROPERTY

Finally, Rambur argues that his counsel was ineffective when he did not request a lawful use of force instruction under RCW 9A.16.020(3) because Rambur acted lawfully to protect his property. While Rambur likely was entitled to a lawful use of force instruction under RCW 9A.16.020(3), his counsel was not deficient for choosing a different trial tactic.

A party is entitled to have his theory of the case presented to the jury by proper instructions, if there is any evidence to support the theory. *Adams*, 31 Wn. App. at 395. Under RCW 9A.16.020, a party may lawfully use force toward another person to prevent "malicious interference" with personal property as long as the force is not "more than is necessary." RCW 9A.16.020(3). Malice may be inferred from an act done in willful disregard of the rights of another. RCW 9A.04.110(12).

Here, Cypher testified that she was throwing and breaking items during her argument with Rambur, that when he held her down she struggled to get up to "break more things," and that when he let her get up, she attempted to break additional items. 1 RP at 66. And Deputy Humphrey testified that Cypher told him some property potentially was damaged during the argument and

13

testified that Rambur mentioned Cypher throwing items and threating to damage expensive paintings that "meant a lot to" Rambur. 2 RP at 171. Thus, because there was at least some evidence that Rambur used the force necessary to stop Cypher from willfully breaking his possessions, he was likely entitled to jury instructions regarding a lawful use of force to protect his property. *Adams*, 31 Wn. App. at 395.

Performance is deficient if it falls "below an objective standard of reasonableness" given all of the circumstances. *Strickland*, 466 U.S. at 688. There is a strong presumption that counsel's performance was reasonable given the deference afforded to decisions of defense counsel in the course of representation. *Grier*, 171 Wn.2d at 32-33. Counsel's conduct is not deficient if it can be characterized as a legitimate trial strategy, but the relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *Grier*, 171 Wn.2d at 33-34. An attorney's failure to raise an affirmative defense can amount to ineffective representation, but determining whether an attorney was ineffective requires review of whether the record confirms a valid strategic decision. *Coristine*, 177 Wn.2d at 379.

At trial, Rambur's attorney chose as his trial tactic to defend against the charge of unlawful imprisonment based on insufficiency of the evidence. In closing argument, defense counsel said the State's case focused on consent and Rambur holding Cypher down for 10 to 15 minutes without lawful authority. He then urged the jury to consider (1) whether Rambur holding Cypher down for 10 to 15 minutes actually interfered with Cypher's liberty given the severity of their argument and how long it lasted overall, (2) that Cypher said Rambur did not substantially interfere with her liberty, and (3) that she changed her story completely from her 911 call to her testimony. Defense counsel also emphasized that Cypher explained that her bruises came from her work at the care

facility and that the deputies did not offer detail about how old the bruising looked. Thus, defense counsel's tactic was to generally emphasize Cypher's lack of credibility and rely on the lack of physical evidence to argue that there was insufficient evidence to prove each element of unlawful imprisonment.

This tactic was strategic and reasonable given the facts before the court. Cypher's trial testimony completely contradicted her statements on the 911 call and to the deputies. Neither deputy said Cypher's bruising looked "fresh," although Deputy Humphrey did testify that there was redness around her forearms and wrists, while Deputy Shannon testified that the marks on Cypher's forearms looked like pressure marks from human hands. No one witnessed Rambur holding Cypher down. Additionally, as the State correctly notes, Cypher testified that Rambur was also throwing and breaking items, including the paintings. She also testified that after he released her from the floor, he "calmly" walked outside rather than calling the police or remaining in the house to protect his belongings. 1 RP at 73. Neither deputy entered the home on the day of the incident so there was no evidence in the record besides Cypher's testimony to confirm that she damaged or was attempting to damage Rambur's belongings. And Deputy Shannon testified that Rambur said Cypher did not break any items but only threatened to.

Thus, defense counsel could have reasonably concluded as part of his trial strategy that in light of the evidence, a defense of property theory was a weak strategy. This theory would be especially weak if, based on Deputy Shannon's testimony, the jury concluded that Cypher only *threatened* to break items, making holding Cypher down "more force than is necessary" under RCW 9A.16.020(3). Defense counsel could have reasonably concluded that focusing on insufficiency of the evidence was a better trial tactic. Rambur's counsel used a reasonable,

15

legitimate trial strategy and, thus, we hold that his claim of ineffective assistance of counsel fails. *Grier*, 171 Wn.2d at 33-34; *Strickland*, 466 U.S. at 688.

### III. PROSECUTORIAL MISCONDUCT

Rambur argues that he was denied a fair trial because the prosecutor committed misconduct during rebuttal argument when she expressed her personal belief in Deputy Shannon's testimony. Even if error, any error was harmless.

We review allegations of prosecutorial misconduct under an abuse of discretion standard. *State v. Ish*, 170 Wn.2d 189, 195, 241 P.3d 389 (2010). Prosecutorial misconduct may deprive a defendant of a fair trial and only a fair trial is constitutional. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). The defendant bears the burden to prove prosecutorial misconduct by proving that the State's conduct was both improper and prejudicial. *Ish*, 170 Wn.2d at 200. To prove that the conduct was prejudicial, the defendant must show that there is a substantial likelihood the misconduct affected the jury's verdict. *Ish*, 170 Wn.2d at 200. The trial judge is generally in the best position to determine whether the prosecutor's actions were improper and whether, under the circumstances, they were prejudicial. *Ish*, 170 Wn.2d at 195-96.

Prejudicial error will not be found unless it is clear and unmistakable that counsel is expressing a personal opinion rather than arguing an inference from the evidence. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). In analyzing prejudice, we do not look at the comment in isolation but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *Warren*, 165 Wn.2d at 28.

Here, Rambur argues that it was improper and he was prejudiced when the prosecutor made the following statements during rebuttal argument:

16

> Counsel said, "Well, see, all you have is Sara Cypher. That's all she said." That's not all you have. You have what she said in the 911 call. You have what she told law enforcement again when they appeared, and you have the physical marks on her arms.
> Now, counsel makes a big deal about, well, the deputies didn't really describe the bruising and the marks. I leave it to you to decide whether the testimony was there, because I believe Sue Shannon, Deputy Shannon.
> [DEFENSE]: Objection.
> THE COURT: Sustained. Disregard that comment. Strike that from the record.

2 RP at 246. After the State finished its rebuttal argument, Rambur moved for a mistrial. The prosecutor claimed that she had not finished her statement and her statement would have been "I believe Deputy Shannon had testified to this." 2 RP at 255. The court denied the mistrial motion because the prosecutor did not repeat the statement; the court believed the prosecutor was in the process of saying something else such as "'I believe that Sue Shannon's testimony was descriptive'" and because even if it was improper, the damage done was minimal. 2 RP at 256-57.

Even if "I believe Sue Shannon" was an improper statement, Rambur has not met his burden to show that he was prejudiced by the comment. 1 RP at 246. First, Rambur incorrectly asserts that *State v. Case*, 49 Wn.2d 66, 68, 298 P.2d 500 (1956), stands for the proposition that "'a prosecutor's claim that she personally believes a particular witness or in the guilt of a defendant is not just unethical 'but extremely prejudicial.'" Br. of Appellant at 27. Contrary to Rambur's argument, *Case* does not state that a prosecutor's expression that she personally believed a witness is inherently extremely prejudicial. And here, in context, the prosecuting attorney's one-time statement that she believed Deputy Shannon, is not a clear, emphatic, or repeated expression of the prosecuting attorney's belief in the defendant's guilt as were the statements at issue in *Case*. We conclude that *Case* is distinguishable.

Second, Rambur unpersuasively argues that the prosecutor's statement was prejudicial because the evidence supporting the charge of unlawful imprisonment was "equivocal at best" and the jury was called upon to measure Deputy Shannon's credibility against Cypher's. Br. of Appellant at 27. The jury did have to weigh Deputy Shannon's credibility regarding what she said she saw and what Cypher told her in relation to Cypher's own testimony, but that was not the sole consideration before the jury when it decided the unlawful imprisonment charge.

The jury also heard the 911 call in which Cypher said she thought Rambur broke her wrist and said she had bruises on her arms and chest from his hands. The jury had to weigh the fact that the 911 call content conflicted with Cypher's testimony in which she said that Rambur did not hurt her when he held her down and that her bruises were from a client at her work. They heard Deputy Humphrey's testimony that he saw bruises, finger marks, and redness on Cypher's arms and wrists. Deputy Humphrey also testified that Cypher told him that "Mr. Rambur had pinned her down." 2 RP at 166. And Deputy Humphrey testified that when he spoke to Rambur the day of the incident, Rambur "admitted to pinning her down." 2 RP at 171.

And even though Cypher's testimony conflicted with what she told the 911 dispatcher and the deputies, she testified that Rambur held her down by her wrists for 10 to 15 minutes restricting her movement without her consent such that she could not get up despite struggling and until he let her get up. Given the evidence presented and excluding the prosecutor's statement allegedly endorsing Deputy Shannon's testimony, it is not substantially likely that the jury would have acquitted Rambur of unlawful imprisonment even if the improper comment had not occurred. Because Rambur failed to prove that there is a substantial likelihood that the prosecutor's improper

personal voucher for Deputy Shannon's testimony affected the jury's verdict, the statement did not prejudice him. *Ish*, 170 Wn.2d at 200.

## IV. LFOs

Rambur argues that the trial court erred by summarily imposing LFOs without any consideration of his ability to pay. We reject this contention.

The trial court's authority to impose LFOs is statutory: "[T]he court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." RCW 10.01.160(3). The record must reflect that the sentencing judge considered the defendant's individual financial circumstances and made an individualized inquiry into the defendant's current and future ability to pay. *State v. Blazina*, 182 Wn.2d 827, 837-38, 344 P.3d 680 (2015). This inquiry also requires the court to consider other factors, such as incarceration and a defendant's other debts when determining a defendant's ability to pay. *Blazina*, 182 Wn.2d at 839.

Notably, the State specifically asked the court to find that Rambur had the means to pay for the costs of his incarceration and Rambur did not object to the imposition of the LFOs. Instead, Rambur appeared to ask for leniency by stating that although he worked "doing home improvement" to pay his rent, he has a serious thyroid condition which is a "significant impairment to working." 3 RP at 273.

The court imposed a total of $3,781.20 in LFOs and ordered these fees payable at $30.00 per month starting 60 days from Rambur's release from jail. Rambur was sentenced to a jail term of five months.

Although this discussion was less than thorough, Rambur incorrectly argues that the trial court imposed LFOs without any consideration of Rambur's ability to pay. Given the short length of Rambur's sentence and Rambur's income from home improvement work, the trial court did not abuse its discretion when it imposed LFOs.

## V. OFFENDER SCORE

The State cross appeals and asks this court to remand to recalculate Rambur's offender score and to resentence Rambur. Rambur argues that the fourth degree assault and unlawful imprisonment crimes constitute the same criminal conduct, thus the assault should not add a separate point to his offender score. In the alternative, Rambur argues that any error was harmless because the court stated it would have imposed the same sentence under either range. We agree with the State.

We review the calculation of an offender score de novo. *State v. Moeurn*, 170 Wn.2d 169, 172, 240 P.3d 1158 (2010). When the sentencing court incorrectly calculates the standard range before imposing a sentence, remand is the remedy unless the record clearly indicates the sentencing court would have imposed the same sentence anyway. *State v. Parker*, 132 Wn.2d 182, 189, 937 P.2d 575 (1997). We must reverse a sentence if it was incorrectly calculated because the judge relied on incorrect information regarding standard ranges. *Parker*, 132 Wn.2d at 192.

Calculation of offender scores for repetitive domestic violence offenses is governed by RCW 9.94A.525 and states in relevant part,

> (21) If the present conviction is for a felony domestic violence offense where domestic violence as defined in RCW 9.94A.030 was plead and proven, count priors as in subsections (7) through (20) of this section; however, count points as follows:
> . . . .

20

(c) Count one point for each adult *prior conviction* for a *repetitive* domestic violence offense as defined in RCW 9.94A.030, where domestic violence as defined in RCW 9.94A.030, was plead and proven after August 1, 2011.

(Emphasis added.) A fourth degree assault domestic violence conviction constitutes a "[r]epetitive domestic violence offense." Former RCW 9.94A.030(41)(a)(i) (2012). A current, rather than prior, conviction for a repetitive domestic violence offense can be included in the calculation of a defendant's offender score for a felony domestic violence offense unless it is the same criminal conduct. *State v. Rodriguez*, 183 Wn. App. 947, 953, 957, 335 P.3d 448 (2014), *review denied*, 182 Wn.2d 1022 (2015).

It was error not to add one point to Rambur's offender score due to his assault conviction pursuant to *Rodriguez*.[3] 183 Wn. App. at 957-58. Here, under former RCW 9.94A.030(41)(a)(i), a fourth degree domestic violence assault constitutes a "[r]epetitive domestic violence offense," and this crime was pleaded and proven by the State as required under RCW 9.94A.525(21)(c). *Rodriguez* requires the then current fourth degree assault conviction adds one point to Rambur's offender score for the felony domestic violence offense of unlawful imprisonment pursuant to RCW 9.94A.525(21)(c). 183 Wn. App at 957-58.

However, Rambur argues that because the two offenses are the same criminal conduct, the trial court correctly determined his offender score. Rambur is incorrect.

Former RCW 9.94A.589(1)(a) (2002) governs consecutive and concurrent sentencing and defines what constitutes "same criminal conduct":

---

[3] The State did not cite to *Rodriguez* at the sentencing hearing and so the trial court could not refer to it, but the State correctly argued that the fourth degree domestic violence assault conviction adds one point to Rambur's offender score.

> Except as provided in (b) or (c) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court *enters a finding* that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. . . . "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

(Emphasis added.)

At sentencing, Rambur did not ask the trial court to make a same criminal conduct finding. And the sentencing court did not make such finding.[4] Therefore, his argument that these two convictions constitute the same criminal conduct fails.

Next, Rambur argues that any error is harmless. After hearing arguments regarding Rambur's offender score and the standard ranges that would apply to each option, the sentencing court stated, "[W]ith respect to the count 2, Unlawful Imprisonment, I find the offender score to be one. It really makes no difference. It gives a standard range of three to eight months. With respect to sentence, on Count 2, Unlawful Imprisonment, five months, credit for three days." 3 RP at 277-78. Rambur interprets the statement "[i]t really makes no difference" to show that the court would have imposed the same sentence regardless of the sentencing range. 3 RP at 278. But the court's statement "[i]t gives a standard range of three to eight months" shows that the court mistakenly relied on the incorrect information that the current domestic violence assault offense did not count toward Rambur's offender score. 3 RP at 278.

---

[4] On the felony judgment and sentence, the box was left blank that said, "Counts _____ encompass the same criminal conduct and count as one crime in determining the offender score (RCW 9.94A.589)." Clerk's Papers at 166.

22

No. 47246-5-II

Thus, because the sentencing court misinterpreted the sentencing guidelines in light of *Rodriguez* and miscalculated the offender score, remand is the proper remedy. *Parker*, 132 Wn.2d at 189.

We affirm Rambur's conviction for unlawful imprisonment, reverse his sentence, and remand for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, P.J.

We concur:

MELNICK, J.

SUTTON, J.

23