## COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>     v.<br><br>FERNANDO MARCOS GUTIERREZ,<br><br>               Appellant. | No. 37557-9-III<br><br><br>**ORDER GRANTING IN PART RESPONDENT'S MOTION FOR RECONSIDERATION** |

THE COURT has considered respondent State of Washington's motion for reconsideration of the opinion filed February 8, 2022. Appellant Fernando Marcos Gutierrez has filed an answer. The panel has considered the motion and the answer and has determined the motion should be granted in part and this matter should be remanded to the trial court for further proceedings consistent with *State v. Westwood*, 2 Wn.3d 157, 534 P.3d 1162 (2023), and the 2023 statutory amendments to RCW 7.68.035 and RCW 43.43.7541, and to reconsider restitution interest in light of the 2022 statutory amendment to RCW 10.82.090. Therefore,

No. 37557-9-III
*State v. Gutierrez*

IT IS ORDERED, the motion for reconsideration of this court's decision of February 8, 2022, is hereby granted in part;

IT IS FURTHER ORDERED, this matter is remanded to the trial court (1) for further same criminal conduct proceedings consistent with the Supreme Court's clarification in *Westwood*, 2 Wn.3d 157, (2) to strike the victim penalty assessment and DNA fees in light of the 2023 statutory amendments to RCW 7.68.035 and RCW 43.43.7541, and (3) to reconsider restitution interest in light of the 2022 statutory amendment to RCW 10.82.090.

_____
**GEORGE FEARING**
**CHIEF JUDGE**

2

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37557-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| FERNANDO MARCOS GUTIERREZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Fernando Marcos Gutierrez appeals after a jury found him guilty as an accomplice of the aggravated first degree murder of Arturo Sosa and the first degree kidnapping and first degree assault of Jose Cano Barrientos. We affirm Gutierrez's convictions, but remand for the trial court to apply the correct same criminal conduct test to the kidnapping and assault convictions.

FACTS

Eustolia Campuzano had been in a relationship with Arturo Sosa for almost three years before breaking up with him in November 2016. Campuzano moved out of the home they shared together and into Paula Rodriguez's home.

Ms. Rodriguez informed Campuzano that she knew some people who could scare Sosa. Ms. Rodriguez took Campuzano to see these people: Fernando Marcos Gutierrez and Gustavo Tapia Rodriguez. Campuzano told these men about Sosa and how she wanted to scare him.

Gutierrez and others developed a plan. Gutierrez told Julio Albarran Varona that he, Albarran Varona, Tapia Rodriguez, and Ambrosio Villanueva were going to beat up Sosa for hitting Campuzano and causing two screws to be placed into her jaw. On the evening of December 8, 2016, these four men and Salvador Gomez armed themselves with guns and went to Ms. Rodriguez's home. Gutierrez had a .40 caliber handgun. Tapia Rodriguez had a .45 caliber handgun.

Tapia Rodriguez told Campuzano they were going to scare Sosa. Most of them drank alcohol and consumed crystal methamphetamine throughout the night.

In the early morning hours of December 9, 2016, Tapia Rodriguez, Gutierrez, Villanueva, Albarran Varona, and Campuzano got into Tapia Rodriguez's GMC Yukon and drove to Sosa's house. They parked on the side of the road near the house until Sosa and a second person, Jose Cano Barrientos, left the house in Cano Barrientos's Ford Explorer. Tapia Rodriguez and his crew followed in the Yukon.

After they reached the highway, Tapia Rodriguez began flashing his lights on and off until Cano Barrientos pulled over to see if something was wrong. Tapia Rodriguez parked his Yukon behind Cano Barrientos's Explorer.

Three or four men got out of the Yukon, all armed with firearms equipped with silencers. Tapia Rodriguez and Gutierrez approached Cano Barrientos's vehicle with

guns drawn; Tapia Rodriguez went to the driver's side and Gutierrez went to the front passenger side. They ordered Cano Barrientos and Sosa out of the Explorer at gunpoint. Deoxyribonucleic acid (DNA) taken from the outside front passenger door handle of Cano Barrientos's vehicle matched Gutierrez's DNA.

Tapia Rodriguez and Gutierrez ordered Cano Barrientos and Sosa to kneel between the two vehicles. They told Cano Barrientos and Sosa, "*te voy matar*," which means, "I'm going to kill you." Report of Proceedings (RP)[1] at 1198. They cocked their guns and pointed them at the heads of Cano Barrientos and Sosa.

By this time, the plan to beat up Sosa had changed to killing both men. Tapia Rodriguez later remarked to Albarran Varona, "[S]ometimes when things don't work out the right way, people have to die." RP at 926.

Realizing that both men were about to be killed, Albarran Varona warned Tapia Rodriguez that there was traffic on the highway. The armed men then loaded Cano Barrientos and Sosa into the back seat of Cano Barrientos's Explorer.

Cano Barrientos sat in the back driver's-side seat, Sosa sat in the back center seat, and Tapia Rodriguez sat in the back passenger-side seat next to Sosa, pointing a gun at

---

[1] "RP" references are to the verbatim report of proceedings of the trial unless otherwise indicated.

him and Cano Barrientos. Albarran Varona was in the driver's seat, holding a pistol with a chambered round. Gutierrez, Villanueva, and Campuzano were in Tapia Rodriguez's Yukon, the lead vehicle, while Albarran Varona followed in Cano Barrientos's Explorer.

About one mile down the road, Sosa and Cano Barrientos tried to wrestle the gun from Tapia Rodriguez. While driving, Albarran Varona pointed his pistol at Sosa. Cano Barrientos then began choking Albarran Varona so he would not shoot Sosa. Albarran Varona fired his gun and the bullet hit Cano Barrientos in his upper chest, near his collarbone, causing him to collapse between the two front seats. Once Albarran Varona regained control of the car, he looked back and saw Tapia Rodriguez put his gun to Sosa's head and shoot three times.

With Gutierrez's help, the men got their guns, some shell casings, and a magazine and left in Tapia Rodriguez's Yukon. Before leaving, Gutierrez made Campuzano look at Sosa's body and threatened to kill her if she said anything.

Cano Barrientos survived. Sosa died.

### *Charges*

The State filed a consolidated information against Gutierrez and Tapia Rodriguez. For Sosa's killing, the State charged both men with murder in the first degree and murder in the second degree, and alleged various special allegations, including

4

allegations that would support a sentence of aggravated first degree murder under

RCW 10.95.020(11)(d).  For Cano Barrientos's abduction, the State charged both men

with first degree kidnapping and first degree assault and alleged various special

allegations.

Albarran Varona was not charged but agreed to testify against Tapia Rodriguez

and Gutierrez in exchange for a plea deal in a different murder case.

*Jury Voir Dire*

During voir dire, venire juror 16 expressed his opinion, that, as an immigrant from

Russia, he experienced prejudice and hostility from others.  He admitted he had racist

thoughts when he was younger but his feelings changed because he kept an open mind

and became more educated and aware.  When jurors were asked whether anyone was

going to hold Tapia Rodriguez's Mexican name or heritage against him, no one, including

juror 16, answered affirmatively.  However, when asked if everyone felt comfortable not

delving into immigration issues because they lacked relevance to the case, juror 16 said,

"Given that I came to this country legally, I think it will bother me."  RP at 507.  "It

would influence my decision, I would think."  *Id.*  Following up on juror 16's comments,

counsel for Tapia Rodriguez clarified that his client's immigration status is irrelevant to

both the facts and the charges.  Juror 16 responded, "Sure, I think that thought would still

linger in the back of my mind." *Id.* at 508. When defense counsel asked, "Would you

hold that against him," juror 16 answered, "Yes." *Id.* Juror 16 then said, "[i]t might be"

problematic for him even if the judge instructed him to ignore it. *Id.* Juror 16 explained

why it was difficult for him to set aside his opinion on illegal immigration:

> JUROR [16]: . . . [Me] and my family came here legally, and it was
> very hard to do so. We followed the proper channels to get to this country
> legally. And so when you see somebody do it illegally, it doesn't matter
> what skin color they are, they're coming from Canada, it doesn't matter. If
> they're doing something illegally, they're breaking the law, they're breaking
> the law in this country.

*Id.* at 508-09. He acknowledged that there are justifications—such as genocide or gang

infestation—for fleeing a dangerous country and such justifications would possibly

change his mind. Yet, even knowing there is a possibility that Tapia Rodriguez fled a

dangerous country, he would hold it against him. Finally, when counsel for Tapia

Rodriguez asked, "[I]s there anything we could convince you or say to you, even with the

judge's instruction, say, you shouldn't hold that, that shouldn't be a factor," juror 16 said,

"I'm ready to listen." *Id.* at 510. He admitted he had already judged Tapia Rodriguez

"[t]o some degree," but repeated, "Like I said, I'm willing to listen." *Id.*

Counsel for the State and the codefendants challenged several jurors for cause, but

none challenged juror 16 for cause. Counsel also exercised their peremptory challenges,

6

but none exercised a peremptory challenge to remove juror 16. Each attorney confirmed that the jury ultimately empaneled, which included juror 16, was the jury he selected.

### *Pretrial Motions in Limine*

In pretrial proceedings, Tapia Rodriguez moved to prohibit attorney Smitty Hagopian, Albarran Varona's former defense attorney, from testifying based on relevance, impermissible bolstering and vouching for Albarran Varona. The State intended to ask Hagopian about his research into protection for people who cooperate with the State and to establish that Albarran Varona had not received the State's investigatory records before his free talk with law enforcement. The court identified Albarran Varona's credibility as the central issue and found the expected testimony was factual and not improper bolstering or vouching. Based on its findings, the court denied Tapia Rodriguez's motion in limine.

During trial, defense counsel elicited testimony from Albarran Varona that Hagopian had prepared him for a free talk with law enforcement and went through the facts of this case.

Hagopian testified he had previously represented Albarran Varona in a murder case and worked out a plea agreement with the State. Part of the agreement required Albarran Varona to tell the State everything he knew about any crimes of which he was

7

aware.  Hagopian had no discovery from the State related to the present case, so he had no

evidence to share with his client before the free talk with law enforcement.  Hagopian sat

in on the free talk and heard Albarran Varona reiterate what he had previously heard from

his client.

### *Jury Instructions*

The State proposed a set of instructions, including a modified Washington Pattern

Jury Instruction accomplice liability instruction.  The modification added the following

language to the standard instruction: "If the defendant is an accomplice to the crime of

assault in any degree, he is deemed to be an accomplice in any other degree of assault."

CP at 246.  Counsel for Gutierrez proposed additional instructions that contained similar

modification language, but, instead of discussing "assault," the modifications discussed

"murder" and "kidnapping."  CP at 46-47.  The parties agreed to consolidate the

modifications into an agreed accomplice liability instruction.

Counsel for Gutierrez explained:

I filed some instructions earlier last week. . . .  There are not too many.
Since you haven't read them, I'll make it a little quicker.  The first two I've
cited, which are relying on WPIC 10.51, [the accomplice liability
instruction].  [The prosecutor] and I agreed to incorporate that in what's
now one of the state's supplemental instructions.  Which explains why they
did that.  So their Supplemental Instruction 10.51, I'm satisfied with,
because it incorporates what wasn't incorporated in their original set of
instructions.  Which is what I wrote. . . .

RP at 2617.

The trial court gave the agreed accomplice liability instruction, which read:

A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

*If the defendant is an accomplice to the crime of murder in any degree, he is* <u>*deemed*</u> *to be an accomplice in any other degree of murder.*

If the defendant is an accomplice to the crime of assault in any degree, he is <u>deemed</u> to be an accomplice in any other degree of assault.

*If the defendant is an accomplice to the crime of kidnapping in any degree, he is* <u>*deemed*</u> *to be an accomplice in any other degree of kidnapping.*

CP at 63 (italics added to show the two sentences Gutierrez requested; underlining added

to assist the reader in an issue raised on appeal).

9

### State's Closing Argument

During closing arguments, the State referred to the court's accomplice liability instruction several times. The prosecutor argued that accomplice liability means: "[I]f you're helping somebody commit a crime with the knowledge that they're committing a crime, you're guilty of that crime. That's what the law says." RP at 2720. He explained to the jury, "[Y]ou and your buddy go up to fight somebody" and "your buddy pulls out a gun and shoots them, you're responsible for that shooting, because you committed a lower level of assault, and your buddy raised it up to the next level." RP at 2721. He concluded that these same "rules" apply to kidnapping and murder. RP at 2722.

### Jury Verdict

After deliberating, the jury returned verdicts finding Gutierrez and his codefendant guilty of all charges, and answered "yes" as to all enhancements, including the enhancement supporting the sentence of aggravated first degree murder.

### Sentencing

Gutierrez, citing *State v. Dunaway*, 109 Wn.2d 207, 743 P.2d 1237 (1987), and other authorities, argued that his convictions of first degree assault and first degree kidnapping against Cano Barrientos should be considered the same criminal conduct for purposes of calculating his offender score and running the convictions concurrently. The

No. 37557-9-III
*State v. Fernando Marcos Gutierrez*

trial court, however, applied the statutory intent analysis in *State v. Chenoweth*, 185

Wn.2d 218, 370 P.3d 6 (2016), to conclude that the crimes were not the same criminal

conduct, consistent with the most recently published Court of Appeals opinion in *State v.*

*Johnson*, 12 Wn. App. 2d 201, 460 P.3d 1091 (2020), *aff'd*, 197 Wn.2d 740, 487 P.3d 893

(2021).  Concluding that "the most recent published case law appears to apply this

statutory element analysis versus the objective factual analysis that was done previously,"

the trial court found that the assault and kidnapping offenses did not "match statutorily."

RP (Apr. 20, 2020) at 126-27.  The trial court reasoned:

> So, the—the element that is different here is the intent to inflict "great
> bodily harm", which is an element that is separate and apart from the other
> charge.  And when you do that objective statutory element review then,
> because there is a difference it does not appear [that they] can be considered
> the same conduct, same criminal conduct.
> So, at this point I am going to make a decision in favor of the State
> on this issue and we'll count those separately.

*Id.* at 127.

The trial court sentenced Gutierrez to life without parole for aggravated first

degree murder, 210 months for first degree assault, and 144 months for first degree

kidnapping.  All sentences were ordered to run consecutively.

11

No. 37557-9-III
*State v. Fernando Marcos Gutierrez*

ANALYSIS

A.    SUFFICIENT EVIDENCE SUPPORTS THE AGGRAVATED MURDER CONVICTION

Gutierrez contends the State failed to produce sufficient evidence that he was a

major participant in the aggravating circumstances of Sosa's murder.

When a defendant challenges the sufficiency of the evidence, the proper inquiry is

whether, after viewing the evidence in the light most favorable to the State, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable

doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable

inferences from the evidence must be drawn in favor of the State and interpreted most

strongly against the defendant." *Id*. This court's role is not to reweigh the evidence or to

substitute its judgment for that of the jury. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d

628 (1980) (plurality opinion). Instead, because the jurors observed testimony firsthand,

this court defers to the jury's decision regarding the persuasiveness of and the appropriate

weight to be given to the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d

970 (2004).

Accomplice liability can apply to any crime, including aggravated first degree

murder. *State v. Mak*, 105 Wn.2d 692, 739-40, 744, 718 P.2d 407 (1986). Generally, to

be an accomplice, the defendant must either (1) solicit, command, encourage, or request

12

that the principal commit the crime, or (2) aid or agree to aid the principal in planning or committing it. RCW 9A.08.020(3)(a)(i),(ii). These acts must be done with the knowledge that they will promote or facilitate the commission of the crime. *Id.* "[B]ecause only general knowledge is required, even if the charged crime is aggravated, premeditated first degree murder . . . 'the crime' for purposes of accomplice liability is murder, regardless of degree." *In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 835, 39 P.3d 308 (2001). In other words, to prove accomplice liability for Sosa's first degree murder, the State had to prove that Gutierrez generally knew that he was facilitating Sosa's murder. Additionally, to prove accomplice liability to support an aggravated murder sentence, the State also had to prove that Gutierrez was a "major participant" in the acts giving rise to Sosa's murder, which depends on *his* conduct, not the principal's conduct. *See State v. Roberts*, 142 Wn.2d 471, 502-03, 14 P.3d 713 (2000); *In re Pers. Restraint of Howerton*, 109 Wn. App. 494, 503-04, 36 P.3d 565 (2001).

There is ample evidence that Gutierrez was a major participant in the events that led to Sosa's murder: Gutierrez was armed with a firearm—a .40-caliber handgun. He was a passenger in the Yukon that followed Cano Barrientos's Explorer on the highway. Once the vehicles pulled over on the side of the highway, Gutierrez got out of the Yukon armed with his firearm, approached the Explorer's front passenger window with his gun

13

drawn, and ordered Sosa out of the vehicle. DNA taken from the outside front passenger door handle of Cano Barrientos's Explorer matched Gutierrez's DNA. Gutierrez and Tapia Rodriguez ordered Sosa and Cano Barrientos to kneel, said they were going to kill them, and pointed their guns at the men's heads.

The State's theory at trial was the plan to beat up Sosa had changed by the time Gutierrez and Tapia Rodriguez had the two men kneel between the parked vehicles. The State asked Albarran Varona if he knew why the plan had changed. He answered that he did not know at the time, but later Tapia Rodriguez told him, "[S]ometimes when things don't work out the right way, people have to die." RP at 926. The evidence, construed in the light most favorable to the State, shows that Gutierrez and Tapia Rodriguez were about to execute the two men when Albarran Varona warned them of approaching traffic. At that point, the decision was made to drive the two men somewhere else.

The evidence, construed in the light most favorable to the State, shows Gutierrez was not merely present and did not simply encourage or aid Tapia Rodriguez in kidnapping and murdering Sosa. Gutierrez, himself, initiated Sosa's abduction by ordering Sosa out of the Explorer at gunpoint. Gutierrez, himself, was about to kill Sosa on the side of the road. Thus, the record shows that Gutierrez was a major participant in the murder of Sosa.

B.       WE DECLINE TO REVIEW AN UNPRESERVED CLAIM OF INSTRUCTIONAL ERROR

For the first time on appeal, Gutierrez assigns error to the jury instruction defining accomplice liability.  He argues the accomplice liability instruction was erroneous and deprived him of his constitutional right to a fair trial because it told the jury it was *required* to find accomplice liability under circumstances where the law only *allows* the jury to find accomplice liability.[2]  Gutierrez focuses on the word "deemed," which appears three times toward the bottom of the instruction fully quoted earlier.  The State responds that this court should decline to review this issue because Gutierrez invited the alleged error.  We agree.

The invited error doctrine prohibits a party from complaining of an error when that party materially contributes to it.  *In re Estate of Reugh*, 10 Wn. App. 2d 20, 62, 447 P.3d 544 (2019).  The doctrine applies when the party "takes affirmative and voluntary action that induces the trial court to take an action that party later challenges on appeal." *Lavigne v. Chase, Haskell, Hayes & Kalamon, PS*, 112 Wn. App. 677, 681, 50 P.3d 306

---

[2] Gutierrez also argues the instruction was constitutionally erroneous by diminishing the State's burden of proof because it allowed the State to argue Gutierrez was an accomplice to *the* crime because he was promoting *a* crime.  We disagree that the instruction permitted this argument.  But to the extent the prosecutor ineloquently made that argument, Gutierrez fails to raise or sufficiently analyze a prosecutorial misconduct claim.

(2002).  Invited error of "whatever kind"—even constitutional error—may not be

complained of on appeal by the party inviting the error.  *State v. Studd*, 137 Wn.2d 533,

546, 973 P.2d 1049 (1999) (invited error doctrine applied to requested Washington

Pattern Jury Instruction subsequently ruled unconstitutional; recognizing strictness of

rule, but refusing to apply a more flexible approach).

Here, Gutierrez proposed two of the three sentences of which he now complains.

In addition, he told the trial court he approved the entire instruction.  These affirmative

acts induced the trial court to give the modified accomplice liability instruction.  We

conclude that the invited error doctrine precludes review of this claim of error.

> C.     WE DECLINE TO REVIEW THE CLAIM OF ERROR RELATED TO HAGOPIAN'S
>        TESTIMONY

Gutierrez argues the trial court erroneously allowed Albarran Varona's former

defense attorney turned deputy prosecutor, Smitty Hagopian, to testify at trial.  Gutierrez

contends that Hagopian's testimony was more prejudicial than probative, constituted

vouching and witness bolstering, and failed to satisfy ER 801's prior consistent statement

standard.

Gutierrez did not object to Hagopian's testimony, either in a pretrial motion in

limine or during trial.  His defense counsel instead said that he was not counsel in a

previous unrelated murder trial involving Gutierrez and was at a substantial disadvantage

when discussing what occurred during that case. This statement was not couched as an objection and it garnered no ruling from the trial court. Instead, Gutierrez's codefendant filed a motion in limine to exclude Hagopian's testimony as irrelevant and improper vouching or bolstering.

"Without an objection, an evidentiary error is not preserved for appeal. Appellant cannot rely upon the objection of a codefendant's counsel to preserve an evidentiary error on appeal." *State v. Davis*, 141 Wn.2d 798, 850, 10 P.3d 977 (2000) (footnote omitted). We therefore decline to review this claim of error.

D. SENTENCING ERROR

Gutierrez contends the trial court abused its discretion by applying the wrong legal standard when it determined his assault and kidnapping convictions were not the same criminal conduct. He asks that we apply the correct legal standard, conclude the two convictions are the same criminal conduct, score them as one offense, and remand for resentencing. We agree in part with Gutierrez's arguments.

Whenever a person is convicted of two or more current offenses that constitute the same criminal conduct, the offenses are counted as one crime. RCW 9.94A.589(1)(a). "Same criminal conduct" "means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id.*

17

The parties accurately note that appellate courts have applied different tests in analyzing same criminal conduct. The inconsistency arises because of two arguably irreconcilable Supreme Court cases. Both cases apply different same criminal conduct tests.

In *Dunaway*, the court held that the same criminal conduct test turns on whether the defendant's objective criminal intent changed from one crime to the next. 109 Wn.2d at 214-15. Years later, in *Chenoweth*, the court held that rape and incest charges arising from the same incident are not the same criminal conduct because the legislature had adopted distinct mens rea for each of the two offenses. 185 Wn.2d at 221. More succinctly, *Dunaway* views the same criminal conduct test as an inquiry into the *defendant's intent*, while *Chenoweth* views the same criminal conduct test as an inquiry into the *statutory mens rea*.

We recently reconciled both cases in *State v. Westwood*, No. 37750-4-III, (Wash. Ct. App. Dec. 16, 2021), http://www.courts.wa.gov/opinions/pdf/377504_pub.pdf. There, we noted that the Supreme Court has continued to follow *Dunaway* and that *Chenoweth* did not explicitly overrule *Dunaway* and its progeny. *Westwood*, slip op. at 10. We therefore limited *Chenoweth* to cases involving rape and incest. *Id.* at 10-11. The trial court did not have the benefit of *Westwood* prior to sentencing. It

18

understandably applied the *Chenoweth* test, reasoning that the most recent Court of

Appeals authority controlled. In doing so, it erred.

We nevertheless decline Gutierrez's invitation to be the court that applies the

*Dunaway* test. The *Dunaway* test must be conducted by the trial court. The trial court

heard the evidence, is better equipped to conduct a hearing, and is the appropriate tribunal

for the necessary factual findings.

We remand for the trial court to determine whether Gutierrez's convictions for first

degree kidnapping and first degree assault are the same criminal conduct. In making this

determination, it should apply the *Dunaway* test, as more fully explained in *Westwood*. If

the trial court determines that Gutierrez's kidnapping conviction and assault conviction

arise out of the same criminal conduct, these two offenses must be scored as one

conviction.[3]

E.    CONSTITUTIONAL RIGHT TO A FAIR TRIAL

By supplemental brief, Gutierrez contends his constitutional right to a fair trial was

denied when the trial court allowed a venire juror to be seated even though the juror was

biased against persons who are in the United States illegally. He asserts the trial court

---

[3] We further note that a party, at resentencing, may submit issues not raised on appeal to ensure the trial court enters the appropriate sentence. *State v. Davenport*, 140 Wn. App. 925, 932, 167 P.3d 1221 (2007).

was required to remove the venire juror sua sponte. We disagree. Gutierrez's argument assumes the trial court knew Gutierrez was in the United States illegally.

A defendant has a constitutional right to an unbiased jury trial. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion); *City of Cheney v. Grunewald*, 55 Wn. App. 807, 810, 780 P.2d 1332 (1989). The presence of a biased juror cannot be harmless and allowing a biased juror to serve on a jury requires a new trial without a showing of prejudice. *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015). If the juror demonstrates actual bias, empaneling the biased juror is a manifest error. *Id.*

A trial judge is obligated to excuse a biased juror even if no party challenges the juror. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 855, 456 P.3d 869, *review denied*, 195 Wn.2d 1025, 466 P.3d 772 (2020). A trial court's erroneous failure to remove a biased juror requires a new trial without demonstrating prejudice. *Id.*

Venire juror 16 expressed bias against individuals, regardless of their country of origin, who enter the United States illegally. He said he would listen to the evidence, but he also admitted he might have prejudged Tapia Rodriguez to some degree even though he did not know his immigration status.

There is nothing in the record that shows the trial court knew, at the time of jury selection, Gutierrez was in the United States illegally.[4] Defense counsel actively challenged jurors for cause but failed to challenge juror 16. This permitted the trial court to infer that defense counsel would produce evidence that their clients were legal residents. Had Gutierrez requested to admit such evidence, the trial court would have allowed it.[5]

Because the trial court did not know that Gutierrez was in the United States illegally, only conjecture supported juror 16's removal. A trial court should be reluctant to interfere with a defendant's constitutional right to present their defense, including strategic decisions made during voir dire. *State v. Lawler*, 194 Wn. App. 275, 285, 374 P.3d 278 (2016) (citing *State v. Coristine*, 177 Wn.2d 370, 374-76, 300 P.3d 400 (2013)). The trial court exercised proper restraint here.

---

[4] The trial court knew that Gutierrez had once been picked up and released the same day by Immigration and Customs Enforcement. This brief detention even warrants the belief that Gutierrez was in the United States *legally*.

[5] Toward the end of trial, Tapia Rodriguez sought to admit evidence that he was born in Texas and was a United States resident. The trial court commented that it would have allowed the evidence but for the State convincing it that the evidence was fraudulent.

No. 37557-9-III
*State v. Fernando Marcos Gutierrez*

Affirmed, but remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Siddoway, A.C.J.                                          Staab, J.

22